LANCASTER SILO & BLOCK COMPANY et al., Appellants, v NORTHERN PROPANE GAS COMPANY, Respondent. (Appeal No. 1.)

LANCASTER SILO & BLOCK COMPANY et al., Appellants, v GOLAY & COMPANY, Respondent. (Appeal No. 2.)

LANCASTER SILO & BLOCK COMPANY et al., Appellants, v GOLCONDA CORP., REGO DIVISION, BASTIAN-BLESSING COMPANY, Respondent. (Appeal No. 3.)

Fourth Department, May 23, 1980

## APPEARANCES OF COUNSEL

*Gross, Shuman, Brizdle, Laub & Gilfillan, P. C. (David C. Laub* of counsel), for appellants.

*Cox, Barrell, Walsh, Roberts & Grace (Gerald Grace* of counsel), for Northern Propane Gas Company, respondent.

*Damon, Morey, Sawyer & Moot (James M. Kieffer* of counsel), for Golay & Company, respondent.

*Barth, Sullivan & Lancaster (John Sullivan* of counsel), for Golconda Corp., Rego Division, Bastian-Blessing Company, respondent.

## OPINION OF THE COURT

SCHNEPP, J.

On February 2, 1971 propane gas leaking from a portable cylinder tank exploded soon after the tank had been stored in a small washroom alongside a gas water heater which operated with a constant pilot light. The explosion and resultant fire occurred on the business premises of the plaintiff, Lancaster Silo, Inc. (Lancaster), and destroyed the building owned by the plaintiff, Lancaster Silo & Block Company, and personal property of the plaintiff, Coral Pools, Inc., stored in the building.

Propane gas "bottled" in cylinders is used by Lancaster as a fuel to propel forklift trucks used in its business of manufacturing farm silos and components thereof. At about 7:00 A.M. on February 2, 1971 Harold Brauen, an employee of Lancaster, preparing to operate a forklift truck, opened the valve of a full tank of propane, which he had installed on the truck

the previous day, and noticed that gas was leaking from the cylinder. He turned the valve which stopped the gas flow, checked the connections which appeared to be in order, turned the gas on again, and observed that it was still leaking. After repeating this process he closed the valve, removed the tank from the truck and placed it in a washroom alongside other propane tanks that were being stored there. Immediately after he set the tank down, Brauen heard the noise of something flying off the tank past his ear and the sound of propane gas escaping. He left the room quickly and the explosion occurred. Fortunately, Brauen escaped injury.

Lancaster possessed the propane gas cylinder pursuant to a rental agreement with the defendant, Northern Propane Gas Company (Northern Propane). Northern Propane regularly supplied Lancaster with full propane gas cylinders and later collected the empty tanks. The defendant Bastian-Blessing Company, Rego Division (Rego), manufactured valve assemblies and fittings for compressed gas systems. The entire valve assembly, attached at the top of the cylinder, served to regulate and control the flow of propane gas from the cylinder. The defendant Golay and Company (Golay) manufactured and distributed propane cylinders to which it attached the Rego valve assembly. Northern Propane purchased the assembly cylinders from Golay, filled them with propane gas and then marked them for commercial use.

The Rego valve includes a wheel assembly consisting of a hand wheel and brass bonnet. The bonnet consists of a hexagonal nut and a threaded shank. The nut screws or tightens the shank into a fitting which is part of the valve assembly. The hand wheel controls the release of the propane gas from the cylinder. A counterclockwise turn on the wheel opens the valve to release the gas and a clockwise turn closes the valve (a right-handed thread). The bonnet of the wheel assembly, however, is attached to the valve assembly on a left-handed thread. Thus, a counterclockwise turn on the wheel to open the valve is in the same direction that screws the wheel assembly into the valve assembly. Conversely, a clockwise turn on the wheel to close the valve is in the same direction that unscrews the wheel assembly from the valve assembly. Apparently the bonnet of the wheel assembly was tenuously held by its threads to its seat (valve assembly) and, after the hand wheel was turned to stop the flow of gas, it blew off the valve assembly releasing the propane gas which was ignited

by the open pilot light under the water heater causing the explosion and fire.

On August 22, 1972 plaintiffs instituted an action for damages against Northern Propane alleging causes of action in negligence and breach of warranty. Thereafter, Northern Propane initiated third-party actions against Golay and Rego. Plaintiffs moved on August 8, 1974 to amend their pleadings to assert their claims directly against Golay and Rego. Special Term in granting the motion held that as third-party defendants Golay and Rego had full and timely notice of plaintiffs' claims and of the transactions and events from which the claims arose. Thus, the court held that the claims were deemed to have been interposed at the time of the third-party complaint for Statute of Limitation purposes (CPLR 203, subd [e]). On appeal we affirmed this order "for the reasons stated at Special Term" (*Lancaster Silo & Block Co. v Northern Propane Gas Co.*, 54 AD2d 820). Plaintiffs allege in their amended complaint that defendant's breach of warranty and negligent design, development, manufacture, assembly, and inspection of the cylinder and valve assembly, and failure to provide warnings and instructions necessary to assure safe usage, caused the explosion and subsequent damage to plaintiffs. At trial, before the case was submitted to the jury, the Trial Justice erroneously dismissed plaintiffs' direct complaints against Golay and Rego, finding that the three-year Statute of Limitations barred plaintiffs' claims. Our prior decision in this case is the law of the case until modified or reversed by a higher court, and the trial court is bound by our decision (*Bolm v Triumph Corp.*, 71 AD2d 429, 434; 10 Carmody-Wait 2d, NY Prac, § 70:453; Siegel, NY Prac, § 448; cf. *Knorr v City of Albany*, 58 AD2d 904; *Trybus v Nipark Realty Corp.*, 26 AD2d 563; see, also, McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C203:11, pp 121, 124).

At the close of the proof, the negligence cause of action was submitted to the jury which returned a verdict of no cause of action. Judgment was entered dismissing the complaint and third-party actions. On this appeal plaintiffs claim that the trial court, in addition to the error outlined above, erred in refusing to instruct the jury on the law of strict liability in tort and the duty of the defendants to warn. Plaintiffs also allege that the court erred in various evidentiary rulings including its refusal to admit evidence of postac-

cident modification of the valve by Rego. We reverse and grant a new trial.

At the trial, plaintiffs offered proof that the length of the threaded shank (.436 inches) of the Rego valve in issue which was manufactured in 1967 did not provide adequate gripping strength and did not conform to industry specifications. Plaintiffs demonstrated that standards promulgated in 1965 by the Compressed Gas Association, American National Standards Institute, fixed the shank length of the hexagon nut at .687 inches. Plaintiffs presented proof that because of the shorter length of the shank and its fewer threads, the Rego valve had a greater propensity to come loose and allow gas to escape than a valve which conformed with the industry standard. Further, plaintiffs submitted proof that it was unsafe to have a left-hand and a right-hand thread on the same fitting because this permitted the valve to come loose when the wheel was turned in a clockwise direction to shut off the gas. Plaintiffs also offered evidence that Northern Propane improperly and inadequately tested and inspected the filled tanks to detect leaks, that it improperly maintained and repaired the valve assembly, that the Rego excess-flow valve and internal components were defective, and that no warnings were provided as to the dangers of storing propane gas near an open flame.

██ Inasmuch as the underlying error of the court was its failure to charge "strict liability", some reference to the present state of the law dealing with the liability of manufacturers, makers of component parts, distributors and retailers of materials for damage caused by their products is relevant to our discussion of the issues in this case. It is well established that the plaintiff in a damage action based on the defective nature of a product may sue on any one or more of four theories: (1) negligence, (2) breach of express warranty, (3) breach of implied warranty, or (4) strict tort liability.

██ This case was tried not only on the theories specifically delineated in plaintiffs' complaint, negligence and breach of warranty, but also on the additional theory of strict liability in tort. As the law of strict products liability has developed, a defective product may consist of: (1) a mistake in manufacturing (i.e., a "flaw", see *Codling v Paglia,* 32 NY2d 330), (2) an improper design (a "design defect", see *Micallef v Miehle Co., Div. of Miehle-Goss Dexter,* 39 NY2d 376, 384-387; *Bolm v Triumph Corp.,* 33 NY2d 151, *supra),* or (3) an inade-

quate or absent warning for the use of the product (see *Torrogrossa v Towmotor Co.,* 44 NY2d 709; *Wolfgruber v Upjohn Co.,* 72 AD2d 59) *(Robinson v Reed-Prentice Div. of Package Mach. Co.,* 49 NY2d 471, 478-479).

Plaintiffs' major contentions are that a design defect existed in the Rego valve and that no notice was provided warning of the dangers attendant upon the use of the propane cylinder. A product is said to be defectively designed when it presents an "unreasonable risk of harm" *(Robinson v Reed-Prentice Div. of Package Mach. Co., supra,* p 479) and liability may be imposed for "unreasonably dangerous design defects" *(Bolm v Triumph Corp.,* 33 NY2d 151, 158, *supra).* Thus, *in a design defect case* there is almost no difference between a prima facie case in negligence and one in strict liability *(Bolm v Triumph Corp.,* 71 AD2d 429, *supra;* cf. *Micallef v Miehle Co. Div. of Miehle-Goss Dexter, supra; Mead v Warner Pruyn Div., Finch Pruyn Sales,* 57 AD2d 340; *Ferry v Luther Mfg. Co.,* 56 AD2d 703). In a negligence action the plaintiff must establish that a manufacturer failed to exercise reasonable care in making his product. Proof that will establish strict liability will almost always establish negligence. In a design defect case the court is concerned with the balancing of the alternative designs available against the existing risk while taking into account the cost of the proposed alternative *(Bolm v Triumph Corp.,* 71 AD2d 429, *supra;* see *Micallef v Miehle Co., Div of Miehle-Goss Dexter, supra;* see, also, Keeton, Manufacturer's Liability: The Meaning of "Defect" in the Manufacture and Design of Products, 20 Syracuse L Rev 559; see, generally, PJI 2:141; 1 NY PJI2d 102, 103, 1979 cumulative supplement).

Other defects complained of by plaintiffs include the remaining varients of strict liability delineated in *Robinson v Reed-Prentice Div. of Package Mach. Co.* (49 NY2d 471, 478-479, *supra).* Evidence of a defective excess pressure valve and a jammed turning wheel was offered to show a "flawed" product as described in *Codling v Paglia* (32 NY2d 330). This variant of strict liability can be established without any showing of negligence, and it is irrelevant that a manufacturer used all reasonable care if the conditions described in *Codling* are met. Finally, the claim that the product as marketed lacked sufficient warnings, while also a branch of strict liability in tort, is determined under traditional negligence analysis *(Wolfgruber v Upjohn Co.,* 72 AD2d 59), as we point out later in this opinion.

■ The differences in the proof between strict tort liability and negligence entitle plaintiffs to an appropriate charge on each of the theories on which they have offered proof.

Although plaintiffs' complaint does not specifically allege a cause of action based on strict tort liability, it identifies the specific instrumentalities in issue and the alleged acts of wrongdoing of the defendants. Moreover, the case was actually tried on a strict tort liability theory. Indeed, both the defendants Golay and Northern Propane claim on this appeal that the trial court in essence charged the doctrine of strict liability in tort. The court, however, refused plaintiffs' request to charge strict liability (2:141, 1979 cumulative supplement; see *Codling v Paglia,* 32 NY2d 330). The court erred in this regard notwithstanding plaintiffs' failure formally to denominate a strict products liability cause of action in the complaint. In the first place, a liberal attitude prevails in overlooking technical deficiencies in denominating causes of action in the pleadings *(Diemer v Diemer,* 8 NY2d 206). Also, we note that courts have been liberal in permitting amended complaints to allege strict products liability *(Gardner v Fyr-Fyter Co.,* 55 AD2d 816; *Murphy v General Motors Corp.,* 55 AD2d 486, 488; see, also, *Velez v Craine & Clark Lbr. Corp.,* 33 NY2d 117). Secondly, the charge should reflect the proof adduced at trial (8 Carmody-Wait 2d, NY Prac, § 57:10). None of the defendants could claim any surprise at plaintiffs' request to charge strict products liability *(Lipner v Levy,* 44 AD2d 797). In fact, the record is replete with colloquy evincing the defendants' acknowledgment of and acquiescence in the fact that products liability was part of the case. Lastly, the evidence bearing on strict products liability was admitted for the most part without objection by the defendants. Although plaintiffs failed to move to conform the pleadings to the proof (CPLR 3025, subd [c]), we find that the pleadings were amended either by consent or acquiescence (4 Weinstein-Korn-Miller, NY Civ Prac, par 4404.17, p 44-60).

■ ■ Plaintiffs further requested that the court charge on the obligations of the defendants appropriately to label the cylinder and give specific warnings of the dangerous propensities of propane gas. As noted above, the failure to warn about the dangers attendant upon the use of the product may also make the product defective *(Robinson v Reed-Prentice Div. of Package Mach. Co.,* 49 NY2d 471, 478-479, *supra).* There is little difference between a failure-to-warn case in negligence

and one brought under strict liability for a product defect. The only element plaintiff need not prove in the strict liability case is the scienter of the defendant, i.e., that he knew of or should have known of the harmful character of the product without a warning (see, generally, 1 NY PJI2d, 103, 1979 cumulative supplement).

■ At trial, the key issue was not whether the actual storage place was unsafe (no party disputed that a washroom in which a water heater was operating with a pilot light was an unsafe place to store propane), but rather (1) whether Northern Propane had a duty to warn; and (2) whether this plaintiff knew or should have known about the specific hazard of storing propane near the water heater. There was a closely balanced question of fact on the issue of contributory negligence related to plaintiffs' alleged misuse and mishandling of the cylinder of propane gas. The court, therefore, included in its instructions a charge on contributory negligence and plaintiffs' burden on that issue. In marshalling the evidence and outlining the theories of liability, however, the court entirely omitted discussion of Northern Propane's possible duty to warn and reference to the plaintiffs' perception of the hazard. Thus, there was no fair balance in the charge as to opposing contentions of the parties (see *Green v Downs*, 27 NY2d 205). The charge as given practically amounted to a directed verdict for the defendant on the issue of contributory negligence.

■ Specific guidelines have not been formulated respecting the duty to warn (e.g., *Torrogrossa v Towmotor Co.*, 44 NY2d. 709, 711, *supra*).[1] The generally accepted rule, however, is that

---

1. Basic guidelines concerning the duty to warn are found in section 388 and comment *k* thereto in the Restatement, Torts 2d Comment *k* provides as follows: "*When warning of defects unnecessary.* One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him, or of facts which to his knowledge make it likely to be dangerous, if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved. It is not necessary for the supplier to inform those for whose use the chattel is supplied of a condition which a mere casual looking over will disclose, unless the circumstances under which the chattel is supplied are such as to make it likely that even so casual an inspection will not be made. However, the condition, although readily observable, may be one which only persons of special experience would realize to be dangerous. In such case, if the supplier, having such special experience, knows that the condition involves danger and has no reason to believe that those who use it will have such special experience as will enable them to perceive the danger, he is required to inform them of the risk of which he himself knows and which he has no reason to suppose that they will realize."

A number of courts have adopted these guidelines (e.g., *Reed v Pennwalt Corp.*, 22

*(n. contd.)*

the reasonableness *vel non* of a set of warnings is a question of fact for the jury *(Wolfgruber v Upjohn Co.,* 72 AD2d 59, *supra; Young v Elmira Tr. Mix,* 52 AD2d 202, 205; *Rainbow v Elia Bldg. Co.,* 49 AD2d 250, 253; see *Bolm v Triumph Corp.,* 33 NY2d 151, 156). Warnings must clearly alert the user to avoid certain uses of the product which would appear to be normal and reasonable. The degree of danger is a crucial factor in determining the specificity required in a warning. Yet, there is no necessity to warn a customer already aware— through common knowledge or learning—of a specific hazard. Nevertheless, in a proper case the court can decide as a matter of law that there is no duty to warn or that the duty has been discharged as a matter of law *(Wolfgruber v Upjohn Co., supra,* p 62; *Biss v Tenneco Inc.,* 64 AD2d 204, mot lv app den 46 NY2d 711). Here the court refused to consider a charge on the duty to warn and erred when it made no ruling whatever with relation to the duty, if any, on the part of these defendants.

▉ Plaintiffs further urge that the court erred in ruling that evidence was inadmissible of a design modification in 1975 by Rego increasing the length of the threaded shank of the wheel assembly's bonnet to .638 inches. The governing rule with respect to postaccidental remedial measures was recently stated by this court in *Bolm v Triumph Corp.* (71 AD2d 429, 437): "evidence of subsequent modification should be admissible if it is probative of what alternatives were available to the manufacturer at the time the product was made so that the jury may determine whether he acted prudently in deciding upon its final design". Rego's post-accident design modification should have been admitted into evidence under the *Bolm* rationale because it was clearly feasible and within the state of the art of the time of manufacture (see *Bolm v Triumph Corp., supra,* p 438, n 2). Lancaster presented proof that national standards within the industry in 1965 (two years before manufacture of the valve in question) required longer threads on the wheel assembly's bonnet. Since design defects are measured by traditional objective reasonable person negligence standards *(Bolm v Triumph,* 71 AD2d 429, *supra; Martin v Dierck Equip. Co.,* 43 NY2d 583, 590; *Micallef v Miehle Co., Div of Miehle-Goss Dexter,* 39 NY2d 376, 387, *supra; Biss*

---

Wash App 718; *Baylie v Swift & Co.,* 27 Ill App 3d 1031; *McPhail v Municipality of Culebra,* 598 F2d 603; *Barnes v Litton Ind. Prods.,* 555 F2d 1184; *Jacobson v Colorado Fuel & Iron Corp.,* 409 F2d 1263).

v Tenneco, Inc., 64 AD2d 204, 205-207, *supra),* the essential inquiry is whether the design chosen was a reasonable one from among the feasible choices of which Rego was aware or should have been aware. Whether or not Rego knew of the national consensus standard is not dispositive. If a given design is within the state of the art, plaintiff can argue that a deviation from that standard is negligence.[2]

It may well be, as a factual matter, that the standard selected (.436 inches) was sufficiently close to the consensus standard of 1965 so as not to be negligent. There was a conflict in expert testimony at trial. Plaintiffs' expert witness testified that the reduced number of threads on the shank increased the propensity of the valve to loosen and come off. Defendant's expert opined that all that was necessary was that a valve have four full turns of threads, which the .436 inch valve actually surpassed. "[T]he reasonableness of choosing among various alternatives and adopting the safest one feasible is not only relevant in a design defect action, it is at the very heart of the case" *(Bolm v Triumph Corp.,* 71 AD2d 429, 437, *supra).* The state of the art sets the parameters of feasibility and it is certainly possible here that a jury might have been inclined to decide the case in favor of plaintiffs when confronted with evidence that the defendant later, without any apparent cost handicap, opted for a design feasible in 1965.

█ The trial court did not err in refusing to charge the doctrine of *res ipsa loquitur.* The elements of *res ipsa loquitur* are: "(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not be due to any voluntary action or contribution on the part of the plaintiff and (4) evidence as to the true explanation of the event must be more readily accessible to the defendant than the plaintiff" *(Fogal v Genesee Hosp.,* 41 AD2d 468, 474; see, also, *De Witt Props. v City of New York,* 44 NY2d 417, 426). Plaintiffs have not demonstrated defendants' control over the instrumentality

2. "State of the art has been defined as 'the safety, technical, mechanical and scientific knowledge in existence and reasonably feasible for use at the time of manufacture' * * * and, also, as the 'contemporaneous practical skill in performance exercised by the designers of products' * * * Thus, state of the art refers to what is realistically capable of achievement, not merely industry custom" (see *Bolm v Triumph Corp.,* 71 AD2d 429, 438, n 2).

which caused the accident (cf. *Corcoran v Banner Super Market,* 19 NY2d 425, 431). Here Lancaster was directly in "control" of the propane tank at the time it was placed near the hot water heater (cf. *March v Carbide & Carbon Chems. Corp.,* 265 App Div 1064). Furthermore, the conduct of Lancaster's employee Brauen constitutes an intervening circumstance which makes the "inference" of negligence supplied by the doctrine simply too tenuous (see *Minotti v State of N. Y.,* 6 AD2d 990; *Lawrence v Davos, Inc.,* 46 AD2d 41, 43; *Feblot v New York Times Co.,* 32 NY2d 486).

The judgments should be reversed and a new trial should be granted in accordance with this opinion.

CARDAMONE, J. P., SIMONS, DOERR and WITMER, JJ., concur.

Judgments unanimously reversed, on the law, and a new trial granted, with costs to abide the event.