OPINION OF THE COURT
Fuchsberg, J.
Central to the issues on this appeal is the admissibility of proof of a postaccident design change in support of a products liability cause of action submitted to a jury on an alleged manufacturing defect.
The plaintiff, Fausto Caprara, received a verdict on each *118 of two causes of action, one in negligence and the other in strict products liability, against Chrysler Corporation and Chrysler Motors Corporation (Chrysler), which designed, manufactured and marketed a Dodge Coronet automobile Caprara was operating at the time of the occurrence which gave rise to this case. The Appellate Division having since affirmed on the facts and the law, though the facts were virgorously contested in the first instance, they must now be taken most favorably to the successful plaintiff (Matter of Kornblum Metals Co. v Instel Corp., 38 NY2d 376, 379; CPLR 5501, subd [b]).[1] Chrysler does not dispute that plaintiff made out a prima facie case.
On that basis, we note that, according to Caprara, he was driving the vehicle into a familiar downhill curve on Congress Street in the City of Troy at 25 to 30 miles per hour when, as he attempted to turn his steering wheel to navigate the turn, “the wheel seized right up”, causing the car to swerve out of control and crash with consequential injuries which include quadreplegia. An experienced driver, whose familiarity with automobiles was heightened by employment in an automobile shop, plaintiff also testified that the steering mechanism had never been altered from the condition it was in when the car was sold by the defendants a year earlier and that, in the intervening time, it had functioned uneventfully.
The parties also produced an avalanche of experts. Of particular pertinence to this appeal is the testimony of plaintiff’s witness William G. Burrill, an engineer specializing in automobile failure analysis, who, with the assistance of ah auto mechanic, had examined the untampered wreck at the shop to which it had been taken after the crash. Burrill and the mechanic implicated a defective lower front ball joint, which helps carry the weight of the car, as the cause of the accident. They found all other parts which could have contributed to the mechanical failure experienced by the plaintiff in good condition.
*119 Specifically, these witnesses established that, though the automobile had only traveled some 9,000 rather than the 80,000 to 150,000 miles the ball joint concededly was intended to last, by actual measurement, it displayed an amount of wear so excessive that it had reached the replacement point and no longer met the State’s official motor vehicle test requirements. Moreover, they went on to explain that, in this condition, it was possible, especially at a time when a downhill shifting of weight and a left hand turn would combine to put stress on the right front, for the joint to move into a chance position in which it could suddenly produce precisely the kind of binding effect Caprara described.
Also figuring on this appeal is the testimony of Daniel W. Doran, supervisor of Chrysler’s steering and suspension department, whom plaintiff also elected to call. In the course of his examination, it was developed, over Chrysler’s objection, that, nearly four years after the plaintiff’s accident, the appellants had modified the design of the joint by adding a plastic insert which eliminated the play which could wear down the ball. Doran further admitted that, for about eight years prior to the Caprara accident, he and Chrysler knew that General Motors had already introduced a substantially similar design change.[2] Although Doran agreed that the movement which the plastic removed could have resulted in wearing, he insisted that the modification was functionally irrelevant and had been adopted solely to discourage unscrupulous mechanics from inducing motorists to replace ball joints prematurely.[3] Returning to *120 the stand, Burrill countered that the design change would serve to alleviate the excessive attrition to which he earlier had attributed the accident-producing malfunction. At this juncture, of course, the plaintiff’s case, as Chrysler concedes, took on aspects compatible with both manufacturing and design defect theories, each a recognized element on which a strict products liability case may be grounded (Robinson v Reed-Prentice Dir. of Package Mach. Co., 49 NY2d 471, 478).
Yet, in sending the case to the jury, the trial court decided, sua sponte and with the concurrence of Chrysler, to submit the products liability case solely on a theory of defective “manufacture and assembly”. As it had on an implied warranty count, it expressly ruled out submission of the design theory as such, apparently in the interest of simplifying the case. Nevertheless, under circumstances hereinafter detailed, the Trial Judge denied defendants’ motion to strike Burrill’s testimony on the effect that the Chrysler design change would have had on the ball joint’s durability. As to the proof supplied through Doran on the subsequent change in ball joint design, at the request of Chrysler and without exception, in its charge the court advised the jury as follows: “I instruct you that this evidence alone and by itself does not establish that the ball joints in the plaintiff’s car were defective. The fact that there are one or more different designs or that there is a design change to a given product does not establish that there is any defect in any particular design, and I so charge you as a matter of law.”
In addition, the court submitted plaintiff’s conceptually unrelated negligence cause of action.
This as background, we now turn to the two contentions on which Chrysler, in the main, posits its quest for a new trial. One is that it was reversible error to admit the evidence of a postoccurrence change in the ball joint design altogether. The second arises from the Trial Judge’s failure to instruct the jury to disregard the Burrill testimony on that subject. We believe both are without merit.
Since the Burrill testimony touches on both points, we treat first with the defendants’ request that the jury be told *121 to disregard what this witness had had to say on the difference the plastic insert would have made to the functioning of the accident-producing ball joint. The procedural genesis for this argument, an attack on the witness’ qualifications as an expert, took the form of a motion to strike, solely on appellant’s assertion “that Mr. Burrill acknowledged the fact that he was not an expert with regard to design of ball joints”. This characterization, presumably made from memory some three weeks after Burrill had testified, went too far. A more studied reading of Burrill’s testimony reveals that the witness never suggested that he did not have a professional understanding of ball joints. In substance, he merely agreed that he was not a designer of and had never participated in constructing one.
This limitation on his background did not necessarily disqualify the witness from testifying on the mechanics and merits of ball joints. As part of his engineering and automobile accident reconstruction background, Burrill, who had supplemented his undergraduate degree in mechanical engineering by completing graduate studies at Rensselaer Polytechnic Institute, had served as consultant to almost every major American automotive manufacturer.[4] In addition, even gainsaying the formal training he enjoyed, his practical experience included actual disassembling and analysis of some 100 ball joints. As may be true, for example, of a knowledgeable music critic who has never written a note, Burrill’s competency could just as well have derived from the real world of everyday use as from that of the laboratory. As the court said in Meiselman v Crown Hgts. Hosp. (285 NY 389, 398), “[l]ong observation and actual experience, though without actual study [may] qualify a witness as an expert” (see, also, Delair v Gaudet, 4 AD2d 736, 737 [engineer qualified by education and experience to give expert testimony on the adequacy of the installation of a heating plant, despite having never installed one]). Accordingly, it was well within the province of the trial court, the one en *122 trusted with the primary responsibility to pass on an expert’s qualification, to have found him qualified.
Indeed, we know the court initially found him so, for it denied the motion to strike. Only when it was renewed as part of a long series of in-chambers requests to charge, made as the case was drawing to a close, did the court indicate that it would grant the motion, and then only to the extent of striking out Burrill’s testimony on design. Then, demurring to a demand that it advise the jury of its ruling, the court stated, instead, that it would handle the matter in its charge. In fact, it never did so. For its part, the Appellate Division opined on review that it would have been an abuse of discretion to have granted the motion. As we see it, contextually, the failure to advise the jury to disregard the testimony in question may be construed as an ultimate de facto decision not to do so. On that premise, we conclude that it was not error for the trial court to have rested on the ruling it announced in its original disposition of the motion.
Now reaching the broader and more basic question of the role of postaccident change in this case, we start by reiterating the long accepted proposition that, in a negligence suit, proof of a defendant’s postaccident repair or improvement ordinarily is not admissible. The reason for applying this rule of evidence to that kind of case is clear. Since at the heart of such an action is either affirmative conduct in creating a dangerous condition or a failure to perceive a foreseeable risk and take reasonable steps to avert its consequences, proof that goes to hindsight rather than foresight most often is entirely irrelevant and, at best, of low probative value. Where such evidence becomes admissible on some other theory or on another issue, such as control, impeachment or feasibility of precautionary measures, almost invariably Trial Judges have thought it best, lest the jury look upon it as an acknowledgment of negligence, to accompany its receipt with appropriate limiting instructions. Although the potential for prejudice would appear to provide ample reason for this cautious approach, some writers have bolstered it by also suggesting that an opposite rule would discourage defendants from repairing dangerous conditions in order to avoid generating evidence against themselves (see, *123 generally, 2 Wigmore, Evidence [Chadbourn rev, 1979], § 283; McCormick, Evidence [2d ed], 666-669; Richardson, Evidence [10th ed — Prince], §§ 168, 221).
Be that as it may, it is the rule that Chrysler claims was violated by the introduction of the evidence of post-accident design change. Recognizing that the question is one of first impression in this court, it would have us hold in principle that this exclusionary practice is as applicable to a strict liability claim as it is to one posited on common-law negligence alone.
Meeting this issue, we do not track unknown terrain. When we adopted the theory of strict products liability as the basis for a cognizable cause of action, we hearkened to the fact that a “developing and more analytical sense of justice, as regards both the economics and the operational aspects of production and distribution has imposed a heavier and heavier burden of responsibility on the manufacturer” (Codling v Paglia, 32 NY2d 330, 339). In this response to a growing societal commitment to product safety, we stressed the need to overcome the inordinately difficult problems of proof which face contemporary consumers who suffer at the hands of articles of commerce whose proclivities to injure so often are within the sole ken of those who design and manufacture them (Lambert, Touchstones of Tort Liability, 33 ATL LJ 378, 402-403).
To that end, under the evolved doctrine of strict products liability, the scienter that is so vital to the negligence suit need not be shown. The shift so wrought is from fault to defect. No longer does anything turn on whether the defendant knew or reasonably could have been expected to know of the defect. Stigmatizing the manufacturer as negligent serves no legal purpose. In easing the path to proof, we have even gone so far as to announce that it is not even essential to a prima facie strict products case that the defect be isolated, for, if a plaintiff “has proven that the product has not performed as intended and excluded all causes of the accident not attributed to defendant, the fact finder may * * * infer that the accident could only have occurred due to some defect” (Halloran v Virginia Chems., 41 NY2d 386, 388). So, while a producer is not an insurer and its product need *124 not be accident proof, it will not be shielded by the fact that it and its employees put forth their best and most meticulous efforts. If the product can be found to be defective when it leaves their possession,[5] if the defect was a substantial factor in producing plaintiff’s injuries, without more the defendant, “the one in the best position to have eliminated those dangers”, must respond in damages (Micallef v Miehle Co., Div. of Miehle-Goss Dexter, 39 NY2d 376, 387)*.
This contrast between negligence and strict products liability law is dramatic. In the former, that a defendant acted with due care will exonerate it from liability to the most seriously injured plaintiff. But, in strict products liability, it is no longer any answer that the defendant injured the plaintiff carefully.[6] Those who market products must stand behind them.
It follows that the logic behind the exclusionary rule, born in a negligence setting, where, absent negligence, liability could not exist, affords little, if any, support for the slavish application of the rule to cases brought on a legal theory so antithetical to the strictures of negligence law that respected scholars have suggested that “the determination of whether a reasonably prudent manufacturer would put the product on the market must be made with the assumption that the manufacturer knew of the dangerous condition of the product” (Wade, On Product “Design Defects” and Their Actionability, 33 Vanderbilt L Rev 551, 567 [1980]). One need not adopt this statement to recognize, that it breathes the spirit of strict products liability.
In alleviating the problems of proof consumers formerly *125 faced in such cases, it cannot have been intended to countenance an evidentiary rule which would so sweepingly exclude postaccident design evidence of a defect simply because it touches on prior conduct which under present law is irrelevant to liability (Twerski, Rebuilding the Citadel, The Legislative Assault on the Common Law, 15 Trial No. 11, at pp 55, 58 [Nov., 1979]). Beyond that, the very economic realities that shaped these legal changes — among others, the growing market share of the mass manufacturer, the well-nigh universality of insurance, the escalation of governmental regulation — undermine any assumption that it is necessary to pay the price of sheltering defendants in strict products liability litigation from evidentiary use of their product changes in order to persuade them to make improvements to which self-interest must propel them in any event (see 2 Weinstein’s Evidence, par 407 [02], at pp 407-9— 407-10, and 1979 Supplement, atpp 110-111; Note, Products Liability and Evidence of Subsequent Repairs, 1972 Duke LJ 837, 848-850; Note, Evidence of Subsequent Repair, Yesterday, Today and Tomorrow, 9 U Cal Davis L Rev 422). At the very least, the balance that, in the traditional negligence cause, was weighted to avoid the prejudice rather than to find the relevancy is tipped the other way in a strict liability suit.
Consonant with the inapplicability of the blanket exclusionary rule to strict products liability cases, a restriction to which we today give our approval, in the present case the evidence of design change was supportive of the “manufacturing and assembly” defect theory on which the trial court sent the strict liability case to the jury. The juxtaposition, both by verbal description and physical examination, of a joint assembled with a plastic insert and one without, by offering a graphic explanation of the slack eventually taken up by the insert, was bound to help the jury understand the defect on which the plaintiff relied. It tended, too, to indicate that the appellants themselves eventually formed the opinion that the ball joints in Caprara’s car had a potential for movement when installed. And, it added to the probability that it was this defect rather than other causes that produced the accident. Thus, reasonable persons in the exercise of their independent judgment could have found the evi *126 dence relevant and material. Nor need the proof have been conclusive for it to be probative. There is no good reason why, as suggested by the dissenters, such evidence should be admitted only when absolutely necessary or as a last resort. To so relegate it would ignore the fact that, in truth-finding, it is at times the quality and at times the quantity which carries conviction.
We thus conclude that the challenged evidence was properly received, most certainly on the strict products liability theory. Furthermore, in light of the fact that Chrysler, as indicated, did not request a charge limiting the purposes for which the evidence could be used, we need not and do not reach the issue of whether in the circumstances here the jury should have been instructed that the evidence should not be considered in determining whether Chrysler was negligent (see Note, Products Liability and Evidence of Subsequent Repairs, 1972 Duke LJ 837, 851-852). This again emphasizes that it is not necessary to decide whether such evidence would have been admissible on a theory of design defect, for the case was not submitted to the jury on that theory.
Finally, as regards the dissenters’ damages discussion, the simple fact is that the defendants preseved for appeal no question other than that contained in their request for a charge on the reduction of plaintiff’s future earnings loss to present value. Nor, on this singular re viewable item, did the defendants offer expert or other proof, or ask the court to take judicial notice of any facts that could have entered into such a calculation, which of course would have to include the impact of the more than offsetting inflation which appears to have become a chronic affliction.
Nor, can we say as a matter of law that the very large reduction effected by the Appellate Division in the size of the general award of damages made for the catastrophic quadreplegic injuries to this 21-year-old plaintiff did not more than subsume any correction that reasonably could be urged. It goes without saying that that court, lacking clairvoyance, in evaluating a verdict intended to compensate for a projected long lifetime of pain, suffering, helplessness and all the other tangible and intangible losses that were sure to *127 follow, faced an unusually difficult judgmental responsibility, for the fulfillment of which no less than a sophisticated elasticity will ever do. In no two cases are the quality and quantity of such damages identical. As has been pointed out by pragmatists and theorists who have wrestled with the problem of how damages in such cases may justly be arrived at, evaluation does not lend itself to neat mathematical calculation (see James, Damages in Accident Cases, 41 Cornell LQ 582, reprinted in Schreiber, Damages in Personal Injury and Wrongful Death Cases, Practicing Law Institute, New York). It follows that, if we are to essay anew the difficult and perhaps complicating venture of delineating more rigid guidelines for the evaluation of an always varying pattern of damages, we had better await a case in which we can reach the question (CPLR 5501, subd [a], par 3; Cohen and Karger, Powers of the New York Court of Appeals [rev ed], § 115).
For all these reasons, the order of the Appellate Division should be affirmed.

. The affirmance was as to liability. On the issue of damages, the Appellate Division modified what was originally a verdict for $3,600,000 by ordering a new trial on that issue unless the plaintiff agreed to stipulate to reduce it to $2,-000,000. He so stipulated.

. Though the proof of alternate design was not introduced at the trial until Doran took the stand, it did not represent a new or surprising theory. The amended complaint and the bill of particulars spoke to a defective steering system which included a defective and improperly designed lower right ball joint. It therefore was not improper for the trial court to allow in the evidence in support of that theory, and the Appellate Division certainly was justified in upholding that ruling (see Di Carlo v Ford Motor Co., 65 AD2d 597; McCormick v State of New York, 51 AD2d 28, 31; 3 Weinstein-Korn-Miller, NY Civ Prac, par 3025.27).

. Though the dissenting opinion assumes that Chrysler never received any complaint of ball joint failure of this type, except for an equivocal answer by Doran as to his personal knowledge of any complaints within an unspecified “short period of time”, a search of the the record merely shows that no offer on this subject was ever made by either side.

. These included General Motors, Ford, American Motors, Mack Truck, International Harvester, Mercedes-Benz and the Bendix Corporation. He also served the United States Government in a like capacity. Chrysler itself had engaged him in another suit brought against it.

. A “defective product” has perhaps been most succinctly defined as one “not reasonably safe” (Wade, Strict Tort Liability of Manufacturers, 19 SW LJ 5, 18) or “unreasonably unsafe” (Department of Commerce Model Uniform Product Liability Act, 44 Fed Reg 62714-62715 [1979]).

, Since this case was not submitted to the jury on a defective design theory, we have no occasion to treat with the balancing of benefits against risks involved in ascertaining whether a product manufactured as designed under the then existing state of the art is reasonably safe (see Robinson v Reed-Prentice Div. of Package Mach. Co., 49 NY2d 471, supra; Barker v Lull Eng. Co., 20 Cal 3d 413; Restatement, Torts 2d, § 402A; Wade, On Product “Design Defects” and Their Actionability, 33 Vanderbilt L Rev 551, 572 et seq.; Wade, On the Nature of Strict Tort Liability for Products, 44 Miss LJ 825, 837). The dissenters’ dissertation on this subject is therefore largely besides the point.