ROGER L. RAINBOW, Appellant, v ALBERT ELIA BUILDING Co., INC., et al., Respondents.

Fourth Department, February 26, 1981

APPEARANCES OF COUNSEL

*Paul William Beltz, P. C. (Russell Quinlan* of counsel), for appellant.

*Hurwitz & Fine, P. C. (Sheldon Hurwitz* of counsel), for Harley-Davidson, respondent.

*Hodgson, Russ, Andrews, Woods & Goodyear (R. William Larson* of counsel), for Albert Elia Building Co., Inc., respondent.

OPINION OF THE COURT

SIMONS, J.

Plaintiff was injured about 12:30 A.M. on July 19, 1970 when he drove his motorcycle southerly into the rear of an automobile parked on the shoulder of Townline Road in Niagara County. The highway north of the accident scene was four lanes wide and the accident happened beyond a point where the road narrowed from four to two lanes. Plaintiff, proceeding in the right lane, drove straight ahead onto the shoulder of the narrowed road and struck the rear of the parked vehicle. After the impact he was propelled approximately 50 feet through the air and landed on the pavement. He sustained a serious injury to his right leg in the accident and he brought this action against defendant Albert Elia Building Co., which had recently completed construction work on the road, claiming that it had improperly signed the area (see *Rainbow v Elia Bldg. Co.*, 49 AD2d 250), and defendant Harley-Davidson, the manu-

facturer of his motorcycle, claiming that his motorcycle was defectively designed because the manufacturer failed to install side crash bars on it to protect his legs.[1]

After six weeks of trial, Trial Term dismissed the complaint at the close of the evidence.

■ The court is unanimous that the action against defendant contractor was properly dismissed. The duty for signing the highway rested with the State. By the terms of the construction contract, certain responsibilities were delegated to the contractor, but there was no proof that it failed to comply with the contract requirements or the directions of State officials, and its obligation was limited by the terms of its agreement (see *Inman v Patterson*, 232 App Div 379; see, also, Highway Law, § 104-a; see Vehicle and Traffic Law, § 1681, subd [e]).

■ The court is also in agreement that plaintiff failed to prove his claim in strict products liability against defendant Harley-Davidson. The dissenters contend, however, that plaintiff's failure of proof was due to adverse and erroneous evidentiary rulings by the court.

A cause of action in strict products liability lies when a manufacturer places on the market a product which has a defect that causes injury when used carefully and in the manner normally intended (see, generally, *Codling v Paglia*, 32 NY2d 330). Plaintiff's claim against defendant Harley-Davidson is a so-called "second collision claim", i.e., plaintiff claims that defendant failed to provide a reasonably safe motorcycle, notwithstanding the fact that the motorcycle was carefully made, because the motorcycle's inadequate design aggravated his injuries (see *Bolm v Triumph Corp.*, 33 NY2d 151; see *Robinson v Reed-Prentice Div. of Package Mach. Co.*, 49 NY2d 471, 478-479; *Micallef v Miehle Co., Div. of Miehle-Goss Dexter*, 39 NY2d 376, 385-386). To establish his claim, he was obliged to prove: (1) that the design was a "substantial factor" in causing the injury and (2) that the motorcycle was unreasonably

---

1. Crash bars are "C" shaped chrome bars affixed to each side of the motorcycle in front of the foot rest. They extend outboard beyond the leg and vertically from the foot to a point below the knee.

dangerous (or not reasonably safe) when made in 1968 *(Bolm v Triumph Corp.,* 71 AD2d 429, 435). Although some of plaintiff's witnesses were seriously discredited on cross-examination, he established a prima facie case on causation by evidence tending to show that the impact between the motorcycle and the parked car was oblique rather than head-on, and that a crash bar on the motorcycle would have protected his leg on impact. Crash bars had existed and were available as optional equipment since the mid-1930's and plaintiff's claim that the motorcycle was unreasonably dangerous was based on his contention that they should be standard rather than optional equipment. Plaintiff failed to prove this contention, however, because he failed to establish that a reasonable person who had knowledge of the product's hazardous character would conclude that it should not be marketed without crash bars (see *Bolm v Triumph Corp.,* 71 AD2d 429, 435, *supra; Lancaster Silo & Block Co. v Northern Propane Gas Co.,* 75 AD2d 55, 62).

Plaintiff's evidence proceeded along two lines. First, he attempted to show that postaccident safety studies established the necessity for crash bars and second, that in 1968 the manufacturer knew of such crash bars (it had, in fact, patented one in 1934) and, therefore, it was obliged to install them on its motorcycle. Plaintiff failed to prove by use of the test studies, or otherwise, that the design of the motorcycle was unreasonably dangerous. He probably could not do so, for the studies, done under the expert witness' direction and upon which he relied when testifying, conceded that the testing of crash bars was "woefully bad", even in 1971, three years after the manufacture of plaintiff's motorcycle and one year after his accident. The report stated: "The whole design, strength of, and fixings for crashbars appear to be woefully bad. They can be regarded as totally ineffective except perhaps in very mild slides where their role is somewhat beneficial. In side impacts and rear impacts they were useless, flattening like corn in a tornado. Considerable further work will be needed to evolve standards for an improved effective design."

It is also worth noting, although we do not decide the case on this ground, that in determining whether a product

is unreasonably dangerous, proper account should be taken of the plaintiff's awareness of its dangerous characteristics and his ability to avoid danger by the exercise of care in his use of it.[2] Some products, and motorcycles typically so, are inherently dangerous. But they are not unreasonably so if at the time of manufacture they present no hazard for the intended user which he does not contemplate *(Robinson v Reed-Prentice Div. of Package Mach. Co.,* 49 NY2d 471, 479, *supra).* In this case we are considering a safety feature that was available as optional equipment. But plaintiff was an experienced motorcyclist and he had been a successful motorcycle racer for many years. He testified that he was familiar with crash bars and their availability and that in fact he had removed crash bars mounted on a previously owned motorcycle, finding them dangerous for his needs. Manifestly, he was in the best position to exercise an intelligent judgment in making the trade-off between cost and function and thus to decide whether crash bars were reasonably necessary on his motorcycle for his purposes. He is the person who should have been required to do so (see *Biss v Tenneco, Inc.,* 64 AD2d 204).

On this state of the record, the jury could not have concluded that defendant's product was unreasonably dangerous when made or that it should have been made with crash bars as standard rather than optional equipment and Trial Term properly dismissed the complaint.

---

2. Commentators, culling from the cases, have suggested seven factors to be considered in deciding whether a product is unreasonably dangerous: (1) the utility of the product to the user and the public as a whole, (2) the safety aspects of the product—the likelihood that it will cause injury or serious injury, (3) the availability of a safer, suitable substitute, (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility, (5) the user's ability to avoid danger by the exercise of care in the use of the product, (6) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of accompanying warning or general public familiarity with the product and its characteristics, and (7) the feasibility on the part of the manufacturer of spreading the loss by setting the price of the product or by insurance (Wade, On the Nature of Strict Tort Liability for Products, 44 Miss LJ 825, 837-838; see, generally, 1 NY PJI 2d 110-112 [1980 Supp]; Model Uniform Product Liability Act, § 104, subd [B], 44 Fed Reg 62714, 62721 [Oct. 31, 1979]).

■ The dissenters contend that a new trial is required because the court unfairly foreclosed plaintiff in his proof. Since they mention only one specific ruling, we discuss it first. They challenge the court's refusal to admit a 1934 patent application for crash bars in which defendant's assignor allegedly claimed that the crash bars were a safety feature. It was clear to all, however, that the bars had been available for motorcycles since the mid-1930's and that they increased safety in some situations. The 35-year-old statement in the patent application added little to the evidence in the record.

The dissenters also object generally to the court's failure to explain its rulings. The court was not required, however, to do so. It made dozens of rulings during this expert's testimony and surely plaintiff's experienced counsel needed no assistance. Nevertheless, the court did explain, and correctly so, that the expert must relate the evidence to the facts of plaintiff's accident and to the circumstances of 1968, the date of manufacture. It is noteworthy that the expert testified for more than two trial days and while many of the court's rulings during his testimony were adverse, counsel was never foreclosed in his proof. He was permitted to use the postaccident test studies at length to establish causation and feasibility, although feasibility was not in issue.

■ Finally, the dissenters contend that the court's rulings were erroneous because a recent Court of Appeals decision permits evidence of postaccident modifications to establish that a product was defective when made (see *Caprara v Chrysler Corp.*, 52 NY2d 114). In our judgment, however, the *Caprara* rule does not require a new trial in this case.

Perhaps it is sufficient to note that in *Caprara (supra)* the court limited its decision to strict product liability cases involving manufacturing flaws, holding that the exclusionary rule did not apply to them because due care is not a defense in such cases. Clearly distinguishable under present New York law is a strict products liability claim of design defect, based as it is on a balancing of risk and

utility factors, and involving considerations of reasonable care[3] (see *Robinson v Reed-Prentice Div. of Package Mach. Co.*, 49 NY2d 471, 479, *supra; Micallef v Miehle Co., Div. of Miehle-Goss Dexter*, 39 NY2d 376, 386, *supra; Bolm v Triumph Corp.*, 33 NY2d 151, 157-158, *supra; Singer v Walker*, 32 NY2d 786, affg 39 AD2d 90, 94; *Lancaster Silo & Block Co. v Northern Propane Gas Co.*, 75 AD2d 55, 62, *supra; Bolm v Triumph Corp.*, 71 AD2d 429, 435, *supra; Biss v Tenneco, Inc.*, 64 AD2d 204, 206-207, *supra; Vinogradov v Clicquot Club Co.*, 55 AD2d 489, 491). The rationale for the *Caprara* ruling does not permit reception of the evidence in a design defect case.

Moreover, the evidence was not admissible because plaintiff failed to lay a proper foundation for it by establishing that the postaccident studies and findings were within the state of the art at the time of manufacture (see *Bolm v Triumph Corp.*, 71 AD2d 429, 437-438, *supra;* cf. *Lancaster Silo & Block Co. v Northern Propane Gas Co.*, 75 AD2d 55, 65, *supra).* In *Bolm,* we reasoned that design defect cases are conceptually analogous to negligence cases. We therefore held that before evidence of postaccident tests and findings was admissible, the tests must be related to the technology of the industry at the time of manufacture. That holding is consistent with decisions of the Court of Appeals handed down both before and after our decision and which hold that a manufacturer's responsibility for a defective design is gauged as of the time the product leaves its hands *(Robinson v Reed-Prentice Div. of Package Mach. Co.*, 49 NY2d 471, 479, *supra;* see *Micallef v Miehle Co., Div. of Miehle-Goss Dexter*, 39 NY2d 376, 386-387, *supra;* see, also, Model Uniform Product Liability Act, § 104, subd [B], par [1], 44 Fed Reg 62714, 62721 [Oct. 31, 1979]). Thus, in this case, the 1971 studies were not relevant unless they were related to the technology of the industry in 1968, the date of manufacture and, "woeful" as they were, they

3. One commentator, quoting from comments to the proposed Model Uniform Product Liability Act, has noted that " 'it is difficult to find an adequate rationale' for applying strict liability in design cases; a 'firmer liability foundation' than 'strict liability' is required for design cases; and strict tort liability for design claims represents an undersirable 'overkill' " (Hoenig, Products Liability, NYLJ, Jan. 30, 1981, p 1, col 1, p 4, col 3).

had no probative value. By contrast, the evidence in the *Caprara (supra)* case presented no such difficulty because in that case the postaccident "modification" had been used by Chrysler's competitors, to the knowledge of Chrysler officials, eight years before the accident.

There are also persuasive policy reasons why the proof in design defect cases should be related to the time of manufacture or sale. A product may be defective because of the way it is made, the way it is designed, or because of failure to provide reasonable warnings for its use. A plaintiff in a strict liability claim involving a manufacturing flaw proves that the product which caused his injury was defectively made in the sense that it did not perform as intended *(Caprara v Chrysler Corp.,* 52 NY2d 114, 123, *supra; Halloran v Virginia Chems.,* 41 NY2d 386, 388; *Fogal v Genesee Hosp.,* 41 AD2d 468, 477-478). In some cases this may be shown by establishing that the product did not conform in some significant respect to the manufacturer's design specifications when it left his hands. A plaintiff in a design defect case, by contrast, claims that the product which caused his injury was made in precise conformity to the manufacturer's specifications but that the product, as designed, was unreasonably dangerous *(Robinson v Reed-Prentice Div. of Package Mach. Co.,* 49 NY2d 471, 478-479, *supra;* see *Caprara v Chrysler Corp., supra,* p 129 [dissenting opn]). In a case involving a manufacturing flaw, nothing turns on fault. The crux of the case is the failure of the product to perform because of some error in the manufacturing process. Generally, that is an objective determination, frequently established by real evidence. Postaccident modifications may be relevant, therefore, and probative of the issue. By contrast the decision that a product is unreasonably dangerous because of its design involves a balancing process to assess whether the benefits of a particular manufacturing design outweigh the risks of using it. A subjective judgment is involved on matters that are frequently scientific, sometimes arcane. At best, the process is imprecise and in all fairness the inquiry should be limited to the technology which exists at the time of manufacture.

In short, the state of the art is an important and relevant inquiry, not only defensively as a qualitative limitation on

liability (see *Micallef v Miehle Co., Div. of Miehle-Goss Dexter, supra,* p 386; *Bolm v Triumph Corp.,* 33 NY2d 151, *supra; Bolm v Triumph Corp.,* 71 AD2d 429, *supra;* see Wade, On Product "Design Defects" and Their Actionability, 33 Vand L Rev 551, 573), but also in determining the admissibility of plaintiff's evidence of postaccident test studies. Successful postaccident testing unavailable when the product was made should not be admissible to prove that the manufacturer, wiser and more experienced on law day, was foolish before.

The judgment should be affirmed.

CARDAMONE, J. P. (dissenting). We agree with the majority's affirmance of the dismissal as to Albert Elia Building Co., Inc. Our difference stems from the dismissal of the complaint against defendant Harley-Davidson on its strict liability claim.

In *Caprara v Chrysler Corp.* (52 NY2d 114), the Court of Appeals distinguished between ordinary negligence suits and strict products liability actions, noting in the former that proof of defendant manufacturer's postaccident design improvement is not admissible because in the traditional concept of negligence, proof going to hindsight is of little probative value. However, in the latter—strict liability action—it held that the *scienter* vital to a negligence suit need not be shown. When a product that causes injuries is defective at the time it left the manufacturer's possession, then the manufacturer, who is in the best position to alleviate these dangers is liable. Further, the court held that in this type of action there is no fear that admission of postaccident design modification evidence will discourage manufacturers from remedying dangerous conditions in its products.

Had plaintiff been permitted to introduce postaccident studies, defendant's product may have been shown to be defective. The trial court took this six-week trial case from the jury upon its finding that plaintiff failed to establish that the absence of crash bars contributed to the cause of plaintiff's injuries. We are all in agreement, however, that plaintiff established a prima facie case on the issue of causation and that the presence of crash bars on the motorcycle would have protected plaintiff's leg on impact (ma-

jority opn, p 290). We believe that the issue of defective design presented a question of fact that should have been resolved by a jury. The trial court's action prevented such resolution and its determination to remove the case from the jury was on the basis of a failure of proof. The difficulty with that conclusion is that the trial court sustained objections to some of the testimony offered by plaintiff's well-qualified expert which might well have established defective design sufficiently for the jury to consider and resolve this issue. The test when taking a case from the jury, that by no rational process could the triers of fact find in favor of plaintiff, it seems to us, may not appropriately be relied upon as a basis for a trial court's dismissal when the trial court itself refuses to permit a rational basis for plaintiff's cause from being introduced into evidence. The record will support a conclusion that the trial court, while sustaining objections to questions posed to plaintiff's expert by plaintiff's counsel repeatedly failed to give the basis of his rulings even when asked. This refusal seriously impaired counsel's efforts to lay the necessary foundation which the majority points out as lacking.

Focusing on plaintiff's expert testimony, objections to attempts to introduce his testimony relative to whether a crash bar patent that Harley-Davidson sought in 1934, whether a crash bar was essential, and whether it was a departure from sound engineering practice to fail to have a crash bar as a standard feature on this motorcycle were all sustained. In short, had the expert been allowed to testify more fully on these matters, his opinion might well have established that defendant manufacturer had produced a motorcycle that was defective. To deprive plaintiff of the benefit of this potential testimony and later grant a dismissal for failure of proof seems to us to be such a substantial error as to require a new trial.

HANCOCK, JR., and MOULE, JJ., concur with SIMONS, J.; CARDAMONE, J. P., and CALLAHAN, J., dissent and vote to reverse in part and grant a new trial as to defendant Harley-Davidson, in an opinion by CARDAMONE, J. P.

Judgment affirmed, without costs.