Fuchsberg, J.
(dissenting). I am compelled to dissent in this case because, in my view, the effect of the majority’s holding is, without good rhyme or reason, to vitiate a contract clause of a kind whose reflection of sound law, good policy, common sense and fair dealing have for long caused lawyers and those of their clients who are engaged in such transactions to adopt it as a standard termination provision of a contract to sell realty (see, e.g., New York Forms, Legal and Business, Form 1:152).
The purpose of the clause is to limit the rights and obligations of each party in the event the seller is unable to convey title in accordance with the contract (see Scerbo v Robinson, 63 AD2d 1096; Artstrong Homes v Vasa, 23 Misc 2d 608 [Meyer, J.]; Lanna v Greene, 175 Conn 453). To say the least, it serves to obviate disputes and to minimize the risks of litigation.
The language of the clause, as employed here, bears repeating : “If, for any reason not the fault of the seller hereunder, seller cannot convey title in accordance with the terms of this contract, the purchaser shall, at its own election, have the right to accept such title as the seller is able to convey, without any claim on the part of the purchaser for abatement of defects or objections, or the purchaser shall have the right to rescind this contract, upon which rescission, pursuant to this paragraph, purchaser will be entitled to the return of the amount paid at the time of signing of this contract, plus the net cost of title examination, if incurred, * * * and upon such repayment this contract shall be null and void”.
Clearly foreseen is the contingency that the seller may be unable to deliver the contemplated title. In that event, in phrases which are not only unambiguous but also well understood in the world of real estate, it is stipulated that the purchaser shall at its election choose between two options. This language is mandatory and places the burden on the purchaser to decide at the closing (or within a reasonable time thereafter, assuming time is not of the es *470 sence) in which of the two designated ways the transaction is then to be brought to an end: either by accepting such title as the seller can convey (but without any abatement in price for title deficiencies), or by rescinding the contract and obtaining a refund of the down payment and title costs. When either of these options is fulfilled, the affair is at an end (Friedman, Contracts and Conveyances of Real Property [3d ed], Conditional Contracts of Sale, § 1.5, p 113).
While, of course, had the seller refused to convey or refund, or deliberately created a defect in title, the buyer could seek recourse in law or equity, it is beyond cavil that this is not such a case. For, as the product of the judicial ministrations of Special Term and a unanimous Appellate Division, it is now conclusively established, by way of an affirmed finding of fact (NY Const, art VI, § 3, subd a; CPLR 5501, subd [b]; see Caprara v Chrysler Corp., 52 NY2d 114, 118), that the seller at all times acted in good faith. Moreover, as the parties both agree, time was of the essence.
The difficulty arose when the seller, for reasons beyond his control, found himself unable to provide the title for which the agreement called. The nub of the defect was inability to comply with an undertaking to deliver the premises free of a tenancy in one of the residential apartments.* As Supreme Court Justice Edwin Kassoff, who presided over the trial in this case, was later to find, and as the Appellate Division again was to affirm, the buyer not only refused to accept title on the scheduled closing date, but, insisting on declaring a default, commenced the suit here within the *471 additional three-week period the seller requested for a final opportunity within which to effect a cure. More importantly, the buyer refused to choose either of the options to which it expressly had been limited in these circumstances. In the suit it instituted, and the lis pendens it filed, it ignored the exculpatory termination clause. Instead, the vendee sought conveyance of either clear title which, according to its own lights, the seller was not then in a position to deliver, or such lesser title as the seller did have power to convey, but with an unbargained abatement in the purchase price.
Needless to say, by requesting remedies which were contractually excluded, the purchaser was, in effect, asking the court to redraft the parties’ contract of sale. It is elementary that equity enforces contracts; it neither reviews nor rewrites them (see Grace v Nappa, 46 NY2d 560, 565).
Haffey v Lynch (143 NY 241), the case on which the majority places such heavy reliance and which doubles as the basis for its Warren Weed’s New York Real Property quotation, is not to the contrary. In Haffey, there simply was no agreement to limit the remedies of the purchaser. The court, therefore, merely held that specific performance could be ordered if, at trial, the seller had good title, even though it had been encumbered at the time of the closing. It nowhere suggests that, had the contract between the parties delineated conditions and terms akin to those contained in the termination clause in the present agreement, the result would not have been entirely different.
Nor is this a case of a buyer, who, having elected to take the property as is for the full purchase price, was confronted by a seller who refused to make the conveyance even on those terms. Surely, in such circumstances, suit would lie, and if, by the time of trial, the title were clear, it seems only right that, having agreed to take the title, flawed or unflawed, he would get the unimpaired one if that be its state when the day of reckoning arrived. For that situation would then be no different from one in which, having accepted the property originally, a purchaser became the beneficiary of the boon of an evaporation of the encumbrance at a later time.
But this is not what happened in the case before us now.
*472 The buyer refused to make the election to which it was committed. By its unmerited suit — seeking a choice to which it had no right — ipso facto, it indefinitely delayed the termination for which the seller had contracted as a means of protection for himself.
The net result of the majority’s ruling, as I see it, is to put one who defies obligations in a position where, to use the vernacular, with impunity it may follow a course of “heads I win, tails you lose”. If, by the time it has finished carrying on its litigation, the rising condition of the real estate market and the course of inflation has appreciated the value of the property (as was the prevailing course of economics in the interval here), the buyer will have succeeded in extending its time to take title, good or bad. If, on the other hand, a downward trend of values has made the property less attractive, any title imperfection presumably would allow it to fully recoup the limited funds it had advanced. And, while the buyer is enjoying these unilateral choices, the seller, as a practical matter, his property clouded by the lis pendens, and though he would not have entered into the contract save for the termination clause, will have had to forego any opportunity that might have come along to sell his property, imperfect as the title might be.
The majority’s claim, that there is no unjust advantage to the seller here because the “action was instituted within two weeks of the aborted closing”, I respectfully suggest, misses the point. The delay which unwarrantedly favored the purchaser is that which occurred between the closing and the actual adjudication. Here it was over a year.
' The overriding irony, all the more so in an equity context, rests in the fact that the purpose of the termination clause was to implicitly provide that the existence of an encumbrance of the title would not constitute a breach. In these circumstances, a title defect could not be the basis for a suit for specific performance to compel the conveyance of an unencumbered title. Rather, only if title were perfect and the seller refused to convey, would specific performance be a proper remedy. Nonetheless, after rejecting title expressly because of its insistence that it was defective, the vendee instituted a suit seeking unencumbered title.
*473 The majority’s refrain that, as a “prerequisite for invoking the restricted remedies clause” on the day of closing, both parties must acknowledge that the seller was unable to give good title is, to say the least, puzzling. First of all, the clause says no such thing; its application is triggered by the objective fact that there is a defect in title and not whether one party or the other thinks so. Secondly, such an interpretation proceeds on the unfounded premise that the buyer, somehow, would have less options if, at closing, the seller disputed the defectiveness of the title. However, as the majority has had to concede, if the title was indisputably bad, the buyer’s only choices were to take the property without abatement or demand its money back. But, even if it were disputed, the buyer would still have precisely the same options for, though the seller did not guarantee that the title would be good, the buyer could choose to take it whether it was encumbered or not.
Therefore, by refusing to take the property at the time of the closing, the buyer elected the refund and his rights became fixed accordingly. The only thing that could have altered this result would have been an ultimate judicial determination that, at the time the buyer made its choice, some act of bad faith on the part of the seller had relegated the buyer to a choice between a bad title and the deposit instead of a choice between a good title and the deposit. In that event, it is conceivable that a court of equity might have sought to right the wrong as of the time of trial when the bad faith was first established. But here, since the irrefragable finding is that of the seller’s good faith, the choice made at the time of the closing must remain fixed.
To summarize, there are only three sets of circumstances in which plaintiff could succeed: (1) It requests its money back and sues for it if it is withheld. (2) It offers to pay the full purchase price for the title as is and sues for it if it is withheld. (3) It sues for specific performance of the unencumbered property, or, in the alternative, for specific performance of the encumbered property with an abatement to compensate for the encumbrance, but only if the seller had been guilty of bad faith. The plaintiff’s suit fell within none of these categories.
*474 All these considerations in mind, it seems impossible to find that the courts below abused their discretion as a matter of law in denying specific performance and limiting the buyer’s remedy to a refund of its down payment. Accordingly, I would affirm.
Judges Jasen, Gabrielli, Wachtler and Meyer concur with Judge Jones; Judge Fuchsberg dissents and votes to affirm in a separate opinion in which Chief Judge Cooke concurs.
Order reversed, etc.

 While the contract of sale, which was entered into on March 27, 1978, set the date for closing of title as July 17, 1978, a handwritten rider provided that the purchaser would not be obliged to close until a landlord-tenant nonpayment dispossess proceeding the seller had brought against his tenant had been resolved in favor of the landlord and the tenancy at issue terminated. In fact, by September 29, 1978, when the seller had advised the buyer that the closing would take place, and again on October 20, 1978, to which the seller asked that it be rescheduled, an order of eviction had issued, the tenant had stipulated to vacate, removing his belongings from the premises and canceling his utilities. Furthermore, the buyer’s own inspection had revealed that the apartment was vacant. Still pending, however, was an appeal by the seller from an order of a Judge in the landlord-tenant court staying the formal final order and warrant.