Walter R. Hart, J.
The complaint herein alleges three distinct causes of action or theories on behalf of plaintiff wife — negligence, implied warranty and express warranty.
The evidence adduced at the trial establishes that in October, 1960 a product known as Ultra Nadinola, manufactured by defendant National Toilet Co. and sold by defendant Saks 34th Street, came to the attention of plaintiff wife by reason of an advertisement in The Daily Netos. The advertisement, showing Saks 34th Street as the vendor, reads as follows:

Not just another cosmetic * * * a completely new formula containing DIMATRON" * * * actually searches out and acts directly on deep-seated discolorations of the skin.
*1067 3.50 3-month supply
Spread Ultra Nadinola over your skin freely wherever age spots occur. It searches out and fades the unsightly blotches, freckles, muddy discolorations * ° * having little effect on the clear area. Gently, thoroughly Ultra Nadinola brings about an over-all effect of even-toned, delightfully youthful coloring, giving the look of fresh, glowing skin vitality. Ultra Nadinola is clinically proven and absolutely safe! Over 200,000 hospital-controlled, cloctorsupervised applications showed not one single case of shin irritation from its use. (Emphasis supplied.)
In November she telephoned Saks 34th Street for a package of the product and it was delivered in a paper carton which bears the legend as follows: “ Ultra Nadinola with Dimatron * is the new hospital test discovery, the new way to fade age spots on hands, facial blotches, freckles, to lighten dark skin. Over 200,000 applications under doctor’s supervision proved new Ultra Nadinola non-irritating, completely safe. * * * (* Dimatron, a compound of the Anisóle type.) ” (Emphasis supplied.) Imprinted on the label on the jar containing the product appears the expression: ‘1 ULTRA Nadinola with Dimatron * is hospital tested and proven. It’s new. It’s safe. * * * *A compound of the Anisóle type.” (Emphasis supplied.)
Plaintiff did not use the product until November 26, the day before Thanksgiving Day, on which day during-the afternoon she opened the jar and applied some of the cream to certain brown spots which had been on the back of her hands. She then applied it again before retiring at about 12:00 or 1:00 o’clock that night. She woke up during the night due to a severe burning sensation in the areas where she had applied the cream. Her hands were puffed up, blistered, red and inflamed. Photographs taken approximately two weeks after the occurrence were marked in evidence and indicate that plaintiff sustained a most uncomfortable and painful injury and that the inflammation extended from above the knuckles to above the wrist. Plaintiff further testified that the inflammation took about two months to clear but that her hands are ‘1 still sensitive ’ ’. She had never, either before or after this incident, suffered from the conditions reflected in the photographs.
Plaintiff’s physician testified that upon her first visit to his office on November 26, plaintiff gave him a history of swelling and blistering from an application of a cream to remove blemishes from the backs of her hands. Upon examining her, he found considerable edema — waterlogging of the skin tissues, blisters filled with fluid, and redness which extended up to about the middle of the forearms. She complained of very severe *1068 burning and itching. The photographs fairly represent the condition of the arms when he first saw her. His diagnosis of this condition was “dermatitis medicamentosa,” which is a blistering due to the application of medication. He prescribed cortisone and soaking with boral solution, and treated them for a period of several weeks. When he saw her on the last visit there was some improvement but there was still swelling, redness and blisters. The doctor testified that plaintiff told him at the time of her first examination that immediately after the application of defendant’s product she suffered from an itching only of the treated areas but had no rash; that four hours later it became worse and blisters appeared. He had never seen a condition such as the plaintiff’s due to any reason other than the application of medication which was that widespread; that for such an extensive area it would have to be caused by a “definite irritant applied to definite areas.” Defendants’ counsel then elicited the following testimony:
“ Q On the first examination of Mrs. Spiegel on the first day and subsequently were you able to tell the cause of this particular condition with any degree of medical certainty? A Well, I couldn’t tell for sure whether it is substance A or B, but since she gave a history of using a particular cream, naturally it applies of course to this cream.
“ Q But this is some speculation on your part?
“ mb. axler : Just a minute.
“ the court: Let him finish. He wants to know whether or not it is mere eonjectur [sic] on your part, speculation, or whether with reasonable medical certainty you came to that conclusion?
1 ‘ A Reasonable medical certainty since it is part of the history. ’’
Defendants rested on plaintiffs’ proof. The trial court subsequently in a written decision awarded plaintiff wife the sum of $1,500 and her husband the sum of $53, stating, in substance, that defendants caused to be issued and publicized the statement “Ultra Nadinola with Dimatron is hospital tested and proven. It is new. It is safe. It works.”. The court then found that this constituted an express warranty; that plaintiff used the product upon the express representation that it was £ £ safe ’ ’; that it was the use of this product alone that was responsible for the injuries. The decision then predicates the award of damages in plaintiffs’ favor on the ease of Cahill v. Inecto (208 App. Div. 191) and rejected as inapplicable the holding in Karr v. Inecto (247 N. Y. 360).
*1069 Defendants on this appeal urge that plaintiff's failed to prove a prima facie case on any theory. It is our conclusion that plaintiffs adduced sufficient evidence to sustain the award on the theory that defendants breached the express warranty that the product was safe in its use by the plaintiff wife. The evidence adduced at the trial parallels that which appears in Cahill v. Inecto (208 App. Div. 191, supra). There plaintiff purchased from defendant a hair dye which she brought to her hairdresser for application, which was commenced about 2:00 p.m., and completed in an hour or an hour and a half. About 9:00 o ’clock her head began to itch and the itching then spread to her face and then to her chest. While the complaint sounded in negligence, the court stressed the circumstance that defendant advertised and its pamphlets stated that the product was “positively safe for use on all healthy skins” (p. 193). The court further observed: ‘1 For aught that appears, it may be used by any one, and does not require the services of a professional hairdresser to apply it, for the same pamphlet states that it is ‘ endorsed and recommended by fifteen thousand Royal, Court and leading Continental hairdressers.— Has received over 20,000 unsolicited letters of praise from users in all parts of Europe. ’ ’
The court, in affirming a judgment in plaintiff’s favor, stated (p. 194):
“We have then a case of a woman, in perfect health, who goes to a hairdresser to have her hair dyed. The latter recommends defendant’s preparation, which she has bought from it and which she applies exactly as directed by the defendant’s printed instructions. This preparation defendant represents to be absolutely harmless, except under conditions not here present. Plaintiff then suffers painful and serious injuries as 'the direct result of the dye thus applied, which her physician testifies, in effect, is the competent producing cause of those injuries, and the sole possible one.
1 £ This, in my opinion, made out a sufficient prima facie case for plaintiff, and adequately sustained the burden of proof she had to assume.
“It was then the defendant’s duty to at least meet this proof by adequate explanation of how the injuries were in fact received. It completely failed to show that plaintiff had any of the physical conditions which made the use of the dye inadvisable for her. It could then have gone further and shown directly by some one in its employ or by a chemist that its preparation contained no chemical or other agent by which *1070 plaintiff’s injuries could possibly have been occasioned. But it carefully refrained from attempting to make any such proof. It produced five hairdressers who had used the dye on customers without injury. It produced two physicians whose testimony proved nothing. * * * The proof of the non-harmful character of the ingredients used in this dye was solely within defendant’s control. It had represented that its composition was harmless. Such proof was required to be made by it if it hoped to meet plaintiff’s case. Not having attempted to do so, it is difficult to see how the jury could have found otherwise than for plaintiff.”
Clearly, the affirmation in the advertisement, on the carton, and on the jar itself that the product was u safe ” constituted an express warranty, which has been defined by section 93 of the Personal Property Law as follows: “ Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon”.
Cases involving implied warranties which exculpate a manufacturer from liability resulting from an unusual susceptibility, idiosyncrasy or allergic reaction of a consumer are not applicable. The implied warranties are that the goods are “ reasonably fit for such purpose [intended] ” (Personal Property Law, § 96, subd. 1) and that they are of merchantable quality. Under such circumstances, a consumer who happens to be allergic to a product may be unable to show that either warranty was violated (see articles, New York Law Journal, entitled “ Allergy and Products Liability To-day,” Oct. 29, 1962 through Nov. 1, 1962; see annotations to Bennett v. Pilot Prods. Co., 235 P. 2d 525 [Utah], 26 ALR 2d 958). But see, also, cases indicating a duty to warn where there is knowledge that even a minuscule percentage of the consuming public may be allergic to the product. (Wright v. Carter, 244 F. 2d 53 [C. A. 2d, 1957].)
In the case here on appeal, the warranty was express, that the product was “ safe ” for anyone who purchased it; the warranty in effect stated that it would be safe in that there would be no allergic reaction. This reasoning was adopted by the court in McLachlan v. Wilmington Dry Goods Co. (41 Del. 378 [1941]). In that case it was alleged that defendant’s employee sold to the plaintiff a two-piece playsuit, assuring her that the sizing therein and other material1 ‘ was not injurious ’ ’. The complaint alleged, inter alia, that the dress contained substances which were poisonous and irritating to the skin, as a result of which *1071 the skin on plaintiff’s face and body erupted. The court, in finding that a sufficient cause of action was alleged predicated on the express warranty, stated (pp. 382-383): “ The statement that the dress was of a color, and that the sizing or any other material therein was not injurious is an affirmation of fact, not mere seller’s talk or the expression of an opinion. The common-sense interpretation to be given the statements as a whole is that the garment was suitable for wear and contained nothing that would cause injury to the plaintiff. * * * It is apparent here from the language of the statements alleged to have been made that the idea of safety in the use of the garment was in the minds of the parties. The warranty is similar in its effect to that in the case of Tyler v. Moody & Offutt, 111 Ky. 191, 63 S. W. 433, 54 L. R. A. 417, 98 Am. St. Rep. 406. There the warranty was that a gas generator was absolutely safe and unable to generate enough gas to explode; and it was held that the idea of personal injury to the operator was in the contemplation of the parties.”
In Rogers v. Toni Home Permanent Co. (167 Ohio St. 244, 4 Ohio Ops. 2d 291, 75 ALR 2d 103), the court held that an action would lie against a manufacturer of a product even in the absence of a direct contract on its express warranty set forth in its advertising that the product was safe and harmless when in fact it was harmful. The principle of law here discussed is also set forth in the annotations in American Law Reports (79 ALR 2d 446) as follows:
“ There is, certainly nothing in the nature of such products as cosmetics, or in the nature of the transactions by which such products are manufactured and sold, to prevent the manufacturer or seller from expressly warranting the products.
“ It has been held that a manufacturer’s liability for breach of express warranty regarding a cosmetic or similar product may arise out of statements made by the manufacturer in his advertisements of the product. An oral statement by a retailer’s clerk that a cosmetic was pure and healthful has been deemed an express warranty, as has a statement by such a clerk that a cosmetic is safe and painless to use. And a cosmetic seller whose employee specially recommended a cosmetic for a particular purpose has, where the cosmetic bore a label stating the same recommendation, been held to have expressly warranted the cosmetic’s suitability for that purpose.”
(See, also, Pritchard v. Liggett & Myers Tobacco Co., 295 F. 2d 292 [1961]; Hamon v. Digliani, 148 Conn. 710 and Marrero v. Gluck, 282 App. Div. 672.)
*1072 The requirement of privity in an action based on express warranties appearing in advertisements has been eliminated in New York by the holding in Randy Knitwear, Inc. v. American Cyanamid Co. (11 N Y 2d 5).
Nor is plaintiffs’ evidence deficient in proof with respect to the causative factors in the product. Such facts could be inferred from the evidence adduced. Inferences drawn from proven facts are matters of common sense and judgment for the trier of the facts. Here plaintiffs’ proof is uncontroverted that prior to the application of the product, she did not suffer from the condition claimed to have been brought about by its use and never again subsequent to the incident. The only portion of her that was affected was the area to which it was applied— a few short hours after its application. Under the circumstances, the court could infer (a) that it was the product that caused the condition, and (b) that it was some ingredient thereof to which she reacted. Drawing these inferences, in our opinion, is not ‘ ‘ remote ’ ’ from the facts adduced. While it may be urged that this is drawing an inference upon an inference, this is not necessarily interdicted. The rule of law was well expressed in Vaccarezza v. Sanguinetti (163 F. 2d 470, 476-477 [Cal.]), where the court, in affirming a verdict for a plaintiff in an action for injury brought about by trichinosis, stated:
‘ ‘ It may be true that some of the other facts here found to exist are based on circumstantial evidence and that such facts are used as a basis of proving, by inference, other facts. But the mere fact that a found fact is based upon circumstantial evidence and is used as a partial basis for another found fact does not of itself violate the reasoning processes permitted by our law. See 1 Wigmore on Evidence, p. 434, § 41; 1 Jones on Evidence, Horwitz Ed., p. 39, § 6e. The statement appearing in some cases that an inference cannot be based upon an.inference, usually without citation and certainly without adequate discussion, does not and cannot mean that an inference cannot be based upon a fact which is itself based upon circumstantial evidence. If that were the rule it would mean that few cases based on circumstantial evidence could ever be tried because it is seldom indeed that but one fact, in such a case, is based on circumstantial evidence. If that were the rule the hundreds of decisions in our books affirming judgments where the findings contain a series of facts each proved by circumstantial evidence would necessarily be wrong. Nearly all departments of reasoning are based upon deducing one fact from another fact that has itself been deduced from a prior fact. The only fallacy that *1073 may occur in such reasoning is where a deduced fact is based upon circumstantial evidence that is unreliable, is too remote or is too conjectural. The true rule is and should be that an inference cannot be based on an inference that is too remote or conjectural. In a civil case, if the first inference is a reasonably probable one it may be used as a basis for a succeeding inference. This is the only conceivable basis upon which the otherwise apparently conflicting cases can be reconciled.
“ The expression that an inference cannot be based upon an inference has been used to dispose of evidence which the appellate court considered too conjectural and too weak in probative value in such cases (citing cases).”
This apparently is also the test in New York, as may bo gleaned from a reading of People v. Foley (307 N. Y. 490. See 20 Brooklyn L. Rev. 277; Richardson, Evidence, 8th Ed., § 152).
The trial court here, therefore, could infer that there was some ingredient in the product which caused the condition and that this ingredient was not “ safe ” for this plaintiff to use as expressly warranted to her. The cases cited by defendants are readily distinguishable. Defendants primarily rely on the case of Karr v. Inecto (247 N. Y. 360, supra). In that case there was no loarranty of any hind. There, a customer brought a bottle of defendant’s hair dye to plaintiff, who was her hairdresser. Plaintiff applied it to her customer’s hair while using gloves. After she removed her gloves, she saw that a few drops of dye were trickling down the customer’s forehead and wiped them off with a piece of cotton, during which process some of the dye stained the plaintiff’s right index finger. During the night the finger became inflamed and subsequently required operative procedures. There was no proof as to any chemical poison in the drug. The court, after noting that no injury occurred to the customer, stated (p. 364): “ Doubtless there are cases where a condition is so closely linked to an antecedent occurrence that the inference that the condition was the result of the occurrence may logically be drawn, even though there is otherwise no evidence as to whether the occurrence might be a competent producing cause of the condition. That is, of course, true wherever other possible causes are excluded. Such was apparently the situation in Cahill v. Inecto, Inc. (208 App. Div. 191).”
It is apparent from the foregoing that the court held that the proof in Cahill was sufficient. As heretofore noted, the quantum of the proof here under review is substantially the same.
*1074 In the case of Fein v. Bonetti (307 N. Y. 682), involving a judgment in favor of a third-party plaintiff against a third-party defendant, there was no breach of an express warranty involved.
Nor is Ravo v. Lido (17 A D 2d 476) applicable. In citing this case, appellant quotes from page 478 as follows: “ Where application of a chemical cosmetic is followed by personal injury of the type that sometimes results from the use of such cosmetics, nevertheless, in the absence of proof, it may not be said that necessarily, and to the exclusion of all other possible causes the application of the cosmetic was the cause of the injury. Causally, the injuries could have been related to toxicity of the chemical in question (citation omitted); to an allergy of the subject person (citation omitted); to the use of improper methods in the process of applying the chemical upon the subject person (citation omitted); or to such person’s contact with other products capable of bringing about the same injurious effect (citations omitted).”
If in the case at bar the injuries were “ related to toxicity of the chemical in question,” undoubtedly liability would follow. If it were due to an “ allergy of the subject person,” she would be protected by the express warranty that the product was safe for her. There is nothing in the record to indicate that plaintiff did not properly apply the product nor is there any evidence that she came in contact with other products capable of bringing about her injuries. In any event, there was no express warranty in the case cited by defendants.
Defendants also stress the case of Zampino v. Colgate-Palmolive Co. (8 A D 2d 304, affd. 8 N Y 2d 1069). Here, too, there was no express warranty that the product was “ safe ”. The trial proceeded against the vendor only (F. W. Woolworth'— the action against the manufacturer, Colgate-Palmolive, was discontinued). The court observed that plaintiff’s injury from the application of the product might have been due to an allergic condition. In my opinion such a circumstance is of no consequence where the product is expressly warranted as safe.
The only other point raised by defendants that merits discussion is that the court erred in permitting plaintiffs’ physician to testify since plaintiffs failed to serve their counsel with a copy of the treating physician’s report. The court overruled the objection on defendants’ admission that their attorney had previously seen the report during an examination before trial and had also seen it on the day of the trial before the physician was called to testify, and at no time indicated to plaintiffs’ *1075 counsel that he would object to the testimony. The action herein was noticed for trial on November 10, 1961. The rule with respect to the exchange of medical information (art. 2 [now Pt. 4] of the Special Rules), did not become effective in this Department until March 1,1962. Clearly, therefore, defendants’ contention is without merit.
The judgment should be affirmed.
Brown and Groat, JJ., concur.
Judgment affirmed, $25 to plaintiffs.