**Marjorie DALEY, Plaintiff,**

v.

**McNEIL CONSUMER PRODUCTS CO., a division of MCNEIL– PPC, INC., Defendant.**

**No. 00 CIV. 5924(CM).**

United States District Court,
S.D. New York.

Sept. 7, 2001.

MEMORANDUM DECISION AND OR-
DER GRANTING IN PART AND
DENYING IN PART DEFEN-
DANT'S MOTION FOR SUMMARY
JUDGMENT

McMAHON, District Judge.

Plaintiff Marjorie Daley sues defendant McNeil Consumer Products Co. ("McNeil") for negligence, strict products liability, and breach of express and implied warranties, for bodily harm she suffered as a result of an allergic reaction she experienced after taking defendant's product, Lactaid. The case was filed in the Supreme Court of the State of New York, County of Westchester, and properly was removed to this Court pursuant to 28 U.S.C. § 1441(a).

Defendants move for summary judgment, and make *in limine* motions to exclude the testimony of plaintiff's proposed experts, Dr. David Rosenstreich and Dr. Howard Schwartz.

FACTUAL BACKGROUND

On a motion for summary judgment, the Court views the facts most favorably to the non-moving party—in this case, the plaintiff.

Plaintiff Marjorie Daley is a 78 year-old woman living in Yonkers, New York. In 1996, she started to experience difficulty digesting dairy products. She saw a television advertisement for Lactaid in or about March 1997. The ad represented that the product would ease the discomfort of digesting dairy products.

On April 22, 1997, after taking Lactaid, plaintiff noticed that her eye was itchy, her earlobe swelled, there was a tingling in her face, and when she rubbed her eyes, some skin would come off. Daley called McNeil Consumer Products Co., via its 1–800–LACTAID number, after suffering her first reaction in April 1997. She asked the representative if there could be any type of reaction from Lactaid, and was told that it could not cause problems because it was a "natural enzyme." In her deposition, plaintiff testified that the conversation went as follows:

Q. So in April of 1997, what did you discuss with the operator at McNeil?

A. I asked her if it could be any reaction to that product.

Q. If there could be any reaction?

A. Yes.

Q. And you had this conversation after you had your first reaction; correct?

A. I think it was right after, yes.

Q. And the person at McNeil said what to you?

A. They said no, because of the product containing a natural enzyme.

Q. They said that there would be no type of reaction from Lactaid?

A. That's right.

(Winter Aff. (Daley Dep. at 100–101) at Ex. D–8.)

McNeil maintains records of all consumer inquiries to its Lactaid "800" number, but has no record of Daley making a call in April or May of 1997. Nor does McNeil have any record of reports or inquiries regarding a skin rash or an "allergic" reaction during this period. (Temple Dep. at 95–96.)

After this conversation, plaintiff continued to take the product. Plaintiff had another reaction on May 30, 1997. She experienced the same symptoms, but also discovered large welts on her arms and the back of her legs. Following the outbreak of the welts, they would begin to blister and peel, leaving purple marks on the skin. Reactions of this nature began to occur every 4 to 6 weeks until December 1998. Plaintiff consulted her primary care physician, Dr. Michael Morelli, on at least four occasions—August 28, 1997, November 20, 1997, January 8, 1998, and February 26, 1998—about her skin reactions.

On or about May 10, 1998, plaintiff felt a tingling in her face, and her hand began to get red. She drove to Lawrence Hospital in Bronxville, New York for immediate medical attention. She was given oxygen and an I.V. that included Benadryl. At Lawrence Hospital, she was asked what prescription medications she was taking. At the time, she was taking a number of prescription medications, including Calan, Provachol and Restoril. No inquiry was made regarding non-prescription medications, so plaintiff did not advise hospital personnel that she was taking Lactaid.

The hospital referred her to a dermatologist, Dr. Neil Goldberg. On May 11, 1998, Dr. Goldberg performed a physical examination, took a medical history, and obtained a skin biopsy where the rash had occurred. In her history, he noted that plaintiff's rash had "stopped for several months" and recently returned. Dr. Goldberg's records indicate that at the time of the appointment, she was taking the prescription medications Calan, Provachol and Restoril.

Daley visited Dr. Goldberg a second time on May 21, 1998, at which time he reviewed the results of the biopsy and examined Daley again. At this visit, Dr. Goldberg diagnosed her as having suffered a fixed drug eruption, most likely caused by the drug Restoril. (Winter Aff. (Goldberg Dep. at 34–35) at Ex. C;.) He relayed this information by letter to plaintiff's primary care physician, Dr. Morelli, in which Dr. Goldberg stated that Daley had suffered from a "[b]iopsy-proven 'fixed-drug eruption,'" in a pattern "consistent with intermittent exposure to a drug like the Restoril." (Winter Aff. at Ex. C.) Plaintiff did not tell Dr. Goldberg that she was taking Lactaid because she did not consider it a "medication."

Dr. Goldberg told plaintiff to stop all medications because he was uncertain which of her medications was causing the problem. However, plaintiff felt that if she stopped them all at once for a month, she would never find out which was the cause of the problem. So she stopped taking Calan, and substituted it with another drug, Vasotec. She continued to take Lactaid. On June 15, 1998, Dr. Goldberg had a telephone conversation with Daley. During this conversation, Daley told him that she had substituted Calan with Vasotec, and that she had experienced another skin outbreak. She also told Dr. Goldberg that she was still taking Restoril, and Dr. Goldberg instructed her to stop taking this medication. Some time after the middle of June 1998, it appears

that Daley discontinued Restoril until sometime in or before November 1998. (Rosenstreich Dep. at 66–67.)

In November 1998, plaintiff had another skin reaction, prompting her to visit an allergist, Dr. David Rosenstreich, at Montefiore Medical Center in the Bronx. During this visit, Dr. Rosenstreich took a medical, environmental and contactant history from Mrs. Daley, which included a survey of Daley's past medical problems and her current exposure to certain medications, foods, and household elements. (Winter Aff. (Rosenstreich Dep. at 53) at Ex. R–3.)

There is an inconsistency in the record as to when plaintiff stopped taking Lactaid. Plaintiff testified that she used Lactaid approximately two to three times per week between March 1997 and December 1998—with a break in August and September 1998. (See Winter Aff. (Daley Dep. at 33–34.) at Ex. D–3.) However, Dr. Rosenstreich's history indicates that Daley discontinued Lactaid sometime around May 1998 (*Id.* at Ex. B. (Rosenstreich Dep. at 66)). The history also reveals that Daley discontinued use of Restoril in June 1998; that she did not suffer any attacks of skin rash for five months thereafter until her attack in November 1998; and that she had resumed taking Restoril, along with Lipitor, Vasotec, and Klonopin in or about November 1998, which is also when she had her next reaction. (*Id.*)

During her first visit, Dr. Rosenstreich performed a number of intradermal skin tests on Daley. Rosenstreich skin tested plaintiff with several of common allergens using pre-mixed "approved" solutions purchased from a commercial vendor. He also skin tested her with a number of other substances to which plaintiff was exposed—including Lipitor, Vasotec, Klonopin, Restoril and Lactaid. Daley brought the prescription drugs and Lac-

taid with her to Dr. Rosenstreich's office for the purpose of conducting skin tests.

Based on the skin test results and the other information Dr. Rosenstreich gathered from plaintiff, he recommended that she follow a specified allergen elimination diet, that she discontinue Lactaid, and that she return for an examination in one week.

Daley returned to his offices on December 2, 1998, at which time he skin tested her to other common allergens and fourteen different foods. Dr. Rosenstreich did not skin test her to the Lactaid or other prescription drugs during the second visit. At the second visit, Dr. Rosenstreich took a follow-up history of plaintiff, which indicated that she was not taking Lactaid or Restoril at the time. (Winter Aff. (Rosenstreich Dep. at 116–119) at Ex. R–9.)

Daley saw Dr. Rosenstreich for a third time on January 6, 1999 and he noted that her skin reactions were going away. Dr. Rosenstreich also noted that Daley had discontinued Lactaid.

On January 11, 1999, Dr. Rosenstreich wrote to Dr. Morelli, giving what he called a "preliminary assessment" of Mrs. Daley, saying:

A detailed ingestion/contactant history revealed a number of potential allergenic exposures including Lactaid pills and several other drugs and chocolate.... Skin testing with a battery of percutaneous allergens revealed significant allergic reactivity to mold spores and Lactaid.

Summary & Formulation:

Our diagnostic evaluation suggested that Mrs. Daley was suffering primarily from a recurrent pruritic skin rash that is uretorial in nature. This problem is due in part to allergy to Lactaid pills.

Recommendations:

Therefore she was placed on an allergen elimination died, told to stop the

Lactaid and counseled on allergenic contactant avoidance. We plan to see her again in 1 week to complete the diagnostic evaluation....

(Winter Aff. at Ex. I.)

Dr. Rosenstreich's final diagnosis was that Daley was suffering from chronic urticaria that was the result of an allergic reaction to "one or more drugs." (Rosenstreich Dep. at 138–39.) Dr. Rosenstreich thought that Lactaid "was one of the significant contributors" to the reactions. (*Id.* at 139, 166.) He told her to stop taking Lactaid, and since she stopped, plaintiff claims that she has not suffered any further skin reactions or symptoms.

In January 1999, following the testing performed by Dr. Rosenstreich, plaintiff again contacted the 1–800–LACTAID number. This time she spoke to a specialist who told her that there were some documented cases similar to what she had experienced. Plaintiff contends that, had she been informed of this during her first call, she would have stopped taking Lactaid immediately, and would not have suffered as she did.

Plaintiff argues that defendant was negligent in its failure to warn her of possible allergic reactions when she initially called the McNeil "800" number. She further argues that as a result of the recommendations and express and implied warranties from McNeil, she continued to take Lactaid to her detriment; that McNeil is strictly liable for putting a product into the market that was unsafe, dangerous and/or hazardous for the use for which it was intended; and that it had a design defect in its failure to warn consumers of dangers of a foreseeable use.

Defendant responds that plaintiff has not adduced any admissible evidence to show that Lactaid caused her injury. Defendant also contends that there is no manufacturing or design defect; that a manufacturer cannot be held liable for failure to warn of idiosyncratic reactions; and that there was no breach of an express or implied warranty.

For the reasons stated below, defendant's motion for summary judgment is granted as to the claim for design defect, failure to warn, and breach of an implied warranty. The motion for summary judgment on the express warranty claim is denied as there remain issues of fact for a jury to resolve.

## DISCUSSION

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When opposing a motion for summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505.

### 1. Strict Products Liability

■ Plaintiff alleges that defendant is strictly liable for providing a product that

was unsafe, dangerous, unfit and/or hazardous for the use for which it was intended. (Compl.¶ 27.) A product may contain a defect as the result of a manufacturing flaw, improper design or a failure to warn. *Sage v. Fairchild–Swearingen Corp.*, 70 N.Y.2d 579, 523 N.Y.S.2d 418, 517 N.E.2d 1304 (1987).

a. Failure to Warn

 Whether a cause of action for failure to warn is based in negligence or strict liability, New York courts consistently have held that a manufacturer has a duty to warn of those dangers that are known or reasonably foreseeable at the time of marketing. *See Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297, 582 N.Y.S.2d 373, 591 N.E.2d 222, 225 (1992). Actual or constructive knowledge of a danger inherent in a product is an essential factor in considering whether a manufacturer is liable. *See, e.g., Goldberg v. Union Hardware Co.*, 162 A.D.2d 658, 659, 557 N.Y.S.2d 104, 105 (2d Dep't 1990). Thus, to impose liability on the manufacturer requires knowledge that the product poses an unreasonable danger. *Kaempfe v. Lehn & Fink Prods. Corp.*, 21 A.D.2d 197, 200, 249 N.Y.S.2d 840 (1st Dep't 1964).

 There is no duty to warn of potential reactions unless a product contains an ingredient "to which a substantial number of the population are allergic." *Kaempfe*, 21 A.D.2d at 200, 249 N.Y.S.2d 840 (quoting Tentative Draft No. 7, Restatement, Torts 2d). If the allergy is one "common to any substantial number of possible users, the seller may be required at least to give warning of the danger." *Id.* But in the case of a useful and reasonably safe product that is in general use, "the supplier owes no special duty of warning to the unknown few who constitute a mere microscopic fraction of potential users who may suffer some allergic reaction not common

to the ordinary or normal person." *Id.* at 201, 249 N.Y.S.2d 840. *See also Chwat v. Smithkline Beecham Corp.*, 818 F.Supp. 36, 37 (E.D.N.Y.1993) *aff'd* 19 F.3d 9 (2d Cir.1994) (granting summary judgment to defendant where manufacturer received 37 complaints about its "safety-coated" aspirin product of 1.3 billion pills sold); *Young v. United States*, 542 F.Supp. 1306, 1310 n. 4 (S.D.N.Y.1982) (denying plaintiff's failure to warn claim regarding swine flu vaccination where only 42 people out of more than 48 million vaccinated suffered a reaction).

In *Kaempfe*, 21 A.D.2d 197, 249 N.Y.S.2d 840, plaintiff suffered a severe dermatitis resulting from an allergic reaction in the use of defendant manufacturer's spray deodorant. She claimed that defendant was negligent in its alleged failure to give adequate warning to persons who might suffer some allergic reaction in the use of the product. *Id.* at 198, 249 N.Y.S.2d 840. The Court held that in order to impose a special duty of warning upon the defendant, she was bound to show (1) that she was one of a substantial number or of an identifiable class of persons who were allergic to the defendant's product, and (2) that defendant knew, or with reasonable diligence should have known of the existence of such number or class of persons. *Id.* The Court dismissed the case because plaintiff failed to prove either of those requirements. As measured by the defendant's sales figures for the product in 1965—the year in which plaintiff used it—users experienced some sensitivity to the product in the ratio of about 1 to 150,000 customers. *Id.* at 199, 249 N.Y.S.2d 840.

 Viewed in that background, plaintiff's failure to warn claim fails as a matter of law. The undisputed facts in this case support dismissal even more strongly than in *Kaempfe*. At the time of plaintiff's reactions, McNeil had not re-

ceived a single report associating the oral ingestion of Lactaid with a fixed drug eruption or allergic reaction like the one described in plaintiff's medical records, despite having distributed more than 600 million caplets. (Temple Aff. at ¶ 6.). Anthony Temple, Vice President of Medical Affairs for McNeil, stated that prior to plaintiff, there were "maybe a hundred or so rashes, a handful of other types of allergies like hives. None that look like this case." (Temple Dep. at 61.) Despite having the burden of proof, plaintiff has not adduced any evidence suggesting that a substantial number of persons suffer any allergic reaction to Lactaid, let alone the one she describes. Given the absence of any evidence suggesting that Lactaid caused adverse skin reactions to more than a microscopic fraction of potential users, defendant had no duty to warn of possible allergic reactions, and this claim is dismissed.

### b. Manufacture or Design Defect Claim

■ Under New York's law of strict products liability, a plaintiff may recover for a design defect by showing that the product, as designed, was not reasonably safe and that the defective design was a substantial factor causing the plaintiff's injury. See Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 108–09, 463 N.Y.S.2d 398, 402, 450 N.E.2d 204 (1983). To recover under a theory of strict products liability for sale of a defectively designed product, it is well established that a plaintiff must plead and prove that there was a feasible design alternative that would have made the product safer. Id.

■ Plaintiff has not met her burden. Lactaid has been used regularly and safely by millions of people for nearly ten years. McNeil has sold over 600 million caplets of Lactaid. Over the years, McNeil spon- sored five studies involving more than 170 patients to investigate the safety and efficacy of the product. None of the individuals who received Lactaid as part of these studies ever experienced a fixed drug eruption, urticaria, rash, hives, an allergic reaction or angioedema while using Lactaid. (Temple Aff. at ¶ 7.) In fact, in these studies, the only reported adverse skin reaction involved a skin rash that occurred after a subject had ingested a placebo, not Lactaid. (Id.)

Plaintiff has done nothing to refute McNeil's evidence of safety. Plaintiff's only evidence challenging the safety of the product is a citation to a single case report involving possible gastrointestinal reactions to Lactaid. (Pl.Opp.Mem.¶ 36.) That article has nothing to do with adverse skin reactions, and plaintiff acknowledges as much in her opposition papers. (Id.) Because plaintiff has not offered any evidence to refute this safety record, her claim based on a theory of design defect cannot survive. See Voss v. Black and Decker Manuf. Co., 59 N.Y.2d at 108–09, 463 N.Y.S.2d 398, 450 N.E.2d 204. Neither has plaintiff offered any evidence that there existed a feasible alternative that would have reduced or eliminated the possibility of skin eruptions caused by ingesting Lactaid.

■ In order to maintain a claim based on a manufacturing defect, Plaintiff must show that the product either was not built to specifications or did not conform to the manufacturer's intended design. See Banks v. Makita, U.S.A., Inc., 226 A.D.2d 659, 661, 641 N.Y.S.2d 875 (2d Dep't 1996); Van Deusen v. Norton Co., 204 A.D.2d 867, 612 N.Y.S.2d 464 (3d Dep't 1994). The record is barren of any evidence whatsoever to support plaintiff's manufacturing defect claim.

Plaintiff's claims based on a theory of strict products liability are therefore dismissed.

## 2. Breach of Express and Implied Warranties

### a. Implied Warranty

■ The implied warranty of merchantability is breached if the good is not fit for the ordinary purpose for which it is used. *See Jones v. Lederle Labs.*, 695 F.Supp. 700, 709 (E.D.N.Y.1988). *See* N.Y.U.C.C. § 2–314(2)(c) (McKinney 1964).

■ As is true of a failure to warn claim, the implied warranty will not be breached if only a small number of people relative to the total number of persons using the product suffer an allergic reaction. *Hafner v. Guerlain*, 34 A.D.2d 162, 164, 310 N.Y.S.2d 141 (1st Dep't 1970). In *Hafner*, plaintiff, after receiving gift bottle of Shalimar perfume, applied portions of it to parts of her body. She then visited the beach where she was exposed to the sun. The following day, red blotches appeared on the areas to which the perfume had been applied. *Id.* at 163, 310 N.Y.S.2d 141. She sued defendant for, *inter alia*, breach of an implied warranty. The court noted that of some 270,000 sales of the perfume in 1963, there were only 25 such complaints received. *Id.* at 164, 310 N.Y.S.2d 141. Finding for the defendant, it stated: "With a product such as this one, sold widely as stated, and easily purchased, the mere fact that an infinitesimal number experienced a discomforting reaction is not sufficient to establish that the product was not fit for the purpose intended." *Id.*

The *Hafner* Court made it clear that the standards enunciated in *Kaempfe* apply with equal force to breach of implied warranty claims. As explained above, because plaintiff has failed to show that she was one of a substantial number or of an identifiable class of persons who were allergic to defendant's product, the claim for breach of an implied warranty fails.

### b. Express Warranty

■ Plaintiff claims that the McNeil "800 number" representative, who told her in April 1997 that her symptoms could not be caused by Lactaid, made an express warranty to the plaintiff. Plaintiff has offered conflicting evidence as to what exactly the representative said during that April 1997 telephone call.

In her sworn deposition testimony, plaintiff stated:

Q. Just so we have everything straight here, there was a conversation in April or March of 1997?

A. Right.

Q. Where you just spoke to a McNeil operator.

A. Yes, and I didn't ask those kinds of questions.

Q. So you're saying now that in 1997 when you spoke to the operator at McNeil, you did not ask them if they heard of other cases similar to yours?

A. I was just curious about the product really. In other words, in January 1997—in April 1997 -

Q. So in April of 1997, what did you discuss with the operator at McNeil?

A. I asked her if it could be any reaction to that product.

Q. If there could be any reaction?

A. Yes.

Q. And you had this conversation after you had your first reaction; correct?

A. I think it was right after, yes.

Q. And the person at McNeil said what to you?

A. They said no, because of the product containing a natural enzyme.

Q. They said that there would be no type of reaction from Lactaid?

A. That's right.

(Winter Aff. (Daley Dep. at 100–101) at Ex. D–8.)

In her affidavit, plaintiff stated:

On or about April 27, 1997, I telephoned the defendant McNeil Consumer Products at the 1–800–LACTAID number provided on the product. I asked the McNeil representative if Lactaid could cause the types of reactions I[had] and asked if they had ever heard of any cases similar to mine. The McNeil representative denied any prior similar reports of allergic reactions; reassured me of Lactaid's safety; and advised me Lactaid could not be the cause of my problems because it was a natural enzyme.

(Daley Aff. ¶ 4.)

Under the law in this Circuit, a Court considering a motion for summary judgment may not rely on an affidavit that contradicts a party's deposition testimony. *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment"); *Raskin v. The Wyatt Company,* 125 F.3d 55, 63 (2d Cir. 1997) ("[W]e follow the rule that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). In the present case, there is a conflict between the plaintiff's sworn testimony and her affidavit. The former indicates that plaintiff did not advise McNeil of her specific symptoms in 1997, while the affidavit drafted for this motion avers the contrary. I must treat plaintiff's deposition testimony as true for purposes of this motion.

Nevertheless, defendant's motion for summary judgment on the breach of express warranty claim is denied.

New York's Uniform Commercial Code states, in pertinent part:

Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis for the bargain becomes part of the express warranty that the goods shall conform to the affirmation or promise.

N.Y. U.C.C. Law § 2–313(1)(a) (McKinney 1993). It also provides that a "statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." N.Y.U.C.C. § 2–313(2) (McKinney 1993).

▮ In order for an express warranty to exist, there must be an affirmation of fact or promise by the seller, the natural tendency of which is to induce the buyer to purchase. *Anderson v. Bungee Int'l Man. Co.,* 44 F.Supp.2d 534 (S.D.N.Y. 1999) (citing *Schimmenti v. Ply Gem Indus., Inc.,* 156 A.D.2d 658, 659, 549 N.Y.S.2d 152, 154 (2d Dep't 1989)); *Bernstein v. Sherman,* 130 Misc.2d 741, 497 N.Y.S.2d 298 (1986) (representation by mechanic, in response to a specific question by plaintiff buyer, that frame of used automobile was in "good condition" constituted an express warranty); *Spiegel v. Saks 34th Street,* 43 Misc.2d 1065, 252 N.Y.S.2d 852 (1964) (statements in advertisement and on package that beauty cream was "safe," "clinically proven and absolutely safe" and "completely safe," and that cream "safely fades away" age spots, constituted an express warranty of safety).

Such an affirmation of fact must be distinguished from puffery, which is not actionable. *See Indep. Order of Foresters v. Donaldson, Lufkin & Jenrette, Inc.,* 919 F.Supp. 149, 152 (S.D.N.Y.1996); *Hubbard v. General Motors Corp.,* No. Civ. A. 95–

4362, 1996 WL 274018 (S.D.N.Y.1996) (explaining that statements like "popular," "most dependable," and "Like a Rock" were generalized and exaggerated claims, and a reasonable consumer could not rely upon them as statements of fact); *Serbalik v. General Motors Corp.*, 246 A.D.2d 724, 726, 667 N.Y.S.2d 503, 504 (3d Dep't 1998) (statement that automobile was "of high quality" and other similar statements were nothing more than innocent "puffery"). The question to be determined, therefore, is: "did the seller assume to assert a fact of which the buyer is ignorant, or did he merely express a judgment about a thing as to which they each may be expected to have an opinion." *Keenan v. D.H. Blair & Co.*, 838 F.Supp. 82, 90 (S.D.N.Y.1993).

The alleged warranty here is the statement, allegedly made over the McNeil hotline, that Lactaid "could not cause a reaction." There is, first and foremost, a question of fact as to whether this statement was ever made. Plaintiff insists that it was, but McNeil has no record that Daley ever had a conversation with one of its operators. Obviously, if there was no conversation, then there was no warranty. Only a jury can make that determination.

Assuming that plaintiff can surmount that hurdle, she must prove that the statement falls within the definition of a warranty, that she relied on it, and that it became part of the basis for the bargain. Defendants argue that the "800" operator's statements constituted a "statement purporting to be merely the seller's opinion or commendation of the goods" under § 2–313(2). In the alternative, defendants contend that she could not have relied on the operator's statements because she had read the Lactaid package that warns consumers: "Consult Your Doctor: If you experience any symptoms, which are unusual or seem unrelated to the condition for which you took this product." (Temple Aff. at Ex. A.) Plaintiff responds that the operator's representation went to the safety of the product, and that she continued to take Lactaid in reliance on those assurances.

Unlike statements that a product is "of high quality," *see Serbalik*, 246 A.D.2d at 726, 667 N.Y.S.2d 503, or "most dependable," *Hubbard*, 1996 WL 274018, the operator's assurance that Lactaid "could not cause a reaction" goes directly to its character and quality. Assuming the conversation actually took place, it is for a jury to determine whether the natural tendency of this statement was to induce plaintiff to purchase and to continue to use the product.

Defendant's motion for summary judgment on the breach of express warranty claim is denied.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part.

This constitutes the decision and order of this Court.